JEFFERSON-PILOT CORPORATION AND SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1488-89.          Filed April 13, 1992.

*Dean F. Chatlain* and *Peter H. Winslow,* for petitioner.
*Albert L. Sandlin, Jr.* and *Clinton M. Fried,* for respondent.

OPINION

RUWE, *Judge:*     Respondent determined deficiencies in petitioner's Federal income tax as follows:

| TYE | Deficiency |
|---|---|
| Dec. 31, 1969 | $177,970 |
| Dec. 31, 1970 | 217,101 |
| Dec. 31, 1971 | 926,035 |
| Dec. 31, 1972 | 1,168,892 |
| Dec. 31, 1974 | 74,096 |
| | 2,564,094 |

Pursuant to the agreement of the parties, all issues contained in the statutory notice of deficiency related to the 1969, 1970, 1971, and 1972 tax years have been settled. With respect to the 1974 tax year, petitioner concedes the worthless stock deduction related to Jefferson-Pilot Fire & Casualty Co.'s $100,000 investment and Jefferson-Pilot Title Insurance Co.'s $51,000 investment in Franklin National Bank preferred stock, as set forth in the statutory notice of deficiency. Petitioner also concedes an adjustment relating to $141,966 of amortization relating to customer lists. The only remaining issue with respect to 1974 is whether petitioner is entitled to deduct a ratable portion of the cost of purchasing FCC broadcast licenses for stations WQXI-AM, WQXI-FM, and KIMN-AM under section 1253.[1]

## Background

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner is a North Carolina corporation with its principal place of business in Greensboro, North Carolina. Petitioner is publicly owned, and its stock is listed on the New York Stock Exchange. Petitioner is a holding company whose subsidiaries provide a variety of insurance, financial, and communications products and services.

Petitioner's broadcasting subsidiary, Jefferson-Pilot Communications Co. (J-P Communications) operates an NBC television network affiliate in Richmond, Virginia, a CBS television network affiliate in Charlotte, North Carolina, and radio stations in Atlanta, Georgia, Charlotte, North Carolina, Denver, Colorado, Miami, Florida, and San Diego, California. J-P Communications also produces and syndicates television sports programming including Atlantic Coast Conference football and basketball, Southeastern Conference basketball, and NASCAR racing events. J-P Communications also supplies computer services to other broadcasting stations, advertising agencies, and station representative firms.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable year 1974, and all Rule references are to the Tax Court Rules of Practice and Procedure.

As of the start of 1974, J-P Communications had operated television station WBTV (Charlotte) since 1949, television station WWBT (Richmond) since 1968, radio station WBT-AM (Charlotte) since 1945, and radio station WBT-FM (Charlotte) since 1947. Petitioner and its nonlife insurance subsidiaries (including J-P Communications) filed a consolidated Federal income tax return for 1974.

By 1973, J-P Communications had developed an acquisition strategy under which it sought to purchase radio stations in major metropolitan markets in the southern United States. Pursuant to this strategy, on August 30, 1973, J-P Communications entered into an agreement with Pacific & Southern Co., Inc., to purchase various assets related to radio station WQXI-AM in Atlanta, Georgia, radio station WQXI-FM in Smyrna, Georgia (an Atlanta suburb), and radio station KIMN-AM in Denver, Colorado (hereinafter referred to as the acquired radio stations).[2] In exchange for the acquired radio stations, J-P Communications agreed to pay Pacific & Southern Co. $15 million. In the agreement, Pacific & Southern Co. warranted that it possessed all licenses necessary to operate the acquired radio stations. The agreement specifically identified these licenses as assets which were to be transferred pursuant to the agreement. The agreement required Pacific & Southern to file for license renewals with the Federal Communications Commission (FCC) if the transaction was not closed by the date that the renewals were due, and the agreement also required that the Commissioner of the FCC consent to the transfer of the licenses as a condition precedent to the closing of the agreement. On September 7, 1973, J-P Communications and Pacific & Southern Co. filed an application with the FCC to assign the broadcast licenses of the acquired radio stations to J-P Communications.

In order to lawfully operate a radio station, the operator must be licensed by the FCC. 47 U.S.C. sec. 301 (1988). Only the FCC may issue radio broadcasting licenses, and FCC approval is required in order to transfer a broadcast license. 47 U.S.C. secs. 303(l)(1), 310 (1988). In connection with the

---

[2]Although J-P Communications was not originally interested in expanding into the Denver market, Pacific & Southern Co. insisted on including KIMN-AM in the sale of WQXI-AM and WQXI-FM.

application for the assignment of the FCC licenses from Pacific & Southern Co. to J-P Communications, J-P Communications retained Media Statistics, Inc., to conduct various surveys of the general public. Media Statistics, Inc., conducted surveys in the Atlanta and Smyrna, Georgia areas, as well as Denver, and surrounding areas of Colorado.

By letter dated January 9, 1974, the FCC granted the application for assignment of the acquired radio stations' licenses to J-P Communications, subject to certain conditions. The FCC imposed a $300,000 transfer fee on the assignment of the FCC licenses. Pursuant to the purchase agreement, J-P Communications and Pacific & Southern Co. each paid one-half of the transfer fee. J-P Communications completed the purchase of the assets of WQXI-AM, WQXI-FM, and KIMN-AM on February 28, 1974.

On December 31, 1974, Manufacturers' Appraisal Co., of Philadelphia, Pennsylvania, issued to J-P Communications a 312-page report on the fair market value of the real estate and personal property of the acquired radio stations as of March 1, 1974. On February 26, 1975, Manufacturers' Appraisal Co. issued to J-P Communications its appraisal report on the intangible assets of the acquired radio stations and incorporated the values of the real estate and personal property detailed in the 312-page report. In accordance with the February 26, 1975, appraisal from Manufacturers' Appraisal Co., petitioner allocated the $15 million purchase price of the acquired radio stations for financial and tax accounting purposes as follows:

|  | WQXI-AM | WQXI-FM | KIMN-AM |
|---|---|---|---|
| Real estate | $35,028 | $7,648 | $362,821 |
| Personal property[1] | 515,627 | 264,009 | 515,016 |
| Customer lists/records | 321,215 | 137,664 | 298,272 |
| Goodwill and all other intangibles[2] | 6,118,390 | 3,059,195 | 3,365,115 |
| Total | 6,990,260 | 3,468,516 | 4,541,224 |

[1]For purposes of this case, the parties agree to the fair market values of the real estate and personal property of the acquired radio stations as reported on petitioner's income tax return for 1974.

[2]Petitioner made no allocation to the FCC licenses and claimed no deduction under sec. 1253 on its income tax return for 1974.

In connection with this litigation, petitioner retained Broadcast Investment Analysis, Inc. (BIA), to prepare a valuation of the intangible assets purchased by J-P Communi-

cations in connection with the transfer of WQXI-AM, WQXI-FM, and KIMN-AM. This valuation allocates the $15 million purchase price, as reduced by the portion of the price allocated to the tangible assets, among various intangible assets. BIA appraised the WQXI-AM, WQXI-FM, and KIMN-AM FCC licenses at $2,090,000, $1,440,000, and $1,892,000, respectively. Based on these reports, petitioner now contends that the $15 million purchase price should be allocated among the various assets purchased as follows:

|  | WQXI-AM | WQXI-FM | KIMN-AM |
|---|---|---|---|
| Real estate | $35,028 | $7,648 | $362,821 |
| Personal property | 515,627 | 264,009 | 515,016 |
| FCC licenses | 2,090,000 | 1,440,000 | 1,892,000 |
| Goodwill, trade names, and all other intangibles | 4,349,605 | 1,756,859 | 1,771,387 |
| Total | 6,990,260 | 3,468,516 | 4,541,224 |

## Discussion

The only remaining issue is whether a ratable portion of the cost of the FCC licenses for WQXI-AM, WQXI-FM, and KIMN-AM is deductible under section 1253(d)(2)(A).[3] Section 1253(d)(2)(A) provides that if a transfer of a franchise, trademark, or trade name is not treated as a sale or exchange of a capital asset under section 1253(a), then any single payment in discharge of a principal sum agreed upon in the transfer agreement shall be deductible ratably by the payor over a period of 10 years or the period of the transfer agreement, whichever is shorter.[4] In order for petitioner to deduct a ratable portion of its payment for the FCC licenses under section 1253(d)(2)(A), we must determine whether an FCC license is a "franchise", as

---

[3]Sec. 1253(d)(2)(A), provides in pertinent part:

SEC. 1253(d). TREATMENT OF PAYMENTS BY TRANSFEREE.—

\*      \*      \*      \*      \*      \*      \*

(2) OTHER PAYMENTS.—If a transfer of a franchise, trademark, or trade name is not (by reason of the application of subsection (a)) treated as a sale or exchange of a capital asset, any payment not described in paragraph (1) [dealing with payments which are contingent on the productivity, use, or disposition of a franchise] which is made in discharge of a principal sum agreed upon in the transfer agreement shall be allowed as a deduction—

(A) in the case of a single payment made in discharge of such principal sum, ratably over the taxable years in the period beginning with the taxable year in which the payment is made and ending with the ninth succeeding taxable year or ending with the last taxable year beginning in the period of the transfer agreement, whichever period is shorter;

[4]Petitioner makes no claim that it is entitled to deductibility over a period shorter than 10 years.

that word is used in section 1253, and whether the sale of the licenses should not be treated as a sale of a capital asset under section 1253(a). Under section 1253(a), a transfer of a franchise shall not be treated as a sale or exchange of a capital asset if the transferor retains any significant power, right, or continuing interest with respect to the subject matter of the franchise.

Section 1253(a) refers to the retention of powers, rights, or continuing interest by the "transferor". It could therefore be argued that section 1253(a) refers only to the "transferor" from whom the taxpayer purchased the franchise. If such a transferor was itself a mere franchisee who retained no significant power, right, or continuing interest in the subject matter of the franchise, the ultimate transferee would not qualify for the deduction allowed by section 1253(d)(2)(A). Respondent, however, has taken the position that the tax treatment accorded to a franchise purchaser should not turn on whether the franchise was purchased from the franchisor or from a prior franchisee and that the requirement in section 1253(a) that the "transferor" retain a significant power, right, or continuing interest is satisfied if the franchisor retains such power, right, or continuing interest. Rev. Rul. 88-24, 1988-1 C.B. 306. The ruling notes that even if no portion of the purchase price is paid to the franchisor, franchise rights continue to flow from a franchisor who has retained rights in the franchise and, in that sense, the franchisor is a "transferor". Thus, even though the entity from whom J-P Communications purchased the licenses retained no power, right, or interest, petitioner will nevertheless qualify for a deduction under section 1253(d) if an FCC license is a "franchise" within the meaning of section 1253 and the FCC retained a significant power, right, or continuing interest in the subject matter of the franchise.

1. *An FCC License Is a "Franchise" Within the Meaning of Section 1253*

Section 1253(b)(1) defines "franchise" for purposes of section 1253(a). Section 1253(b)(1) states: "The term 'franchise' *includes* an agreement which gives one of the parties to the agreement the right to distribute, sell, or provide goods, services, or facilities, within a specified area." (Emphasis

added.) "Franchise" is not a general word in section 1253; it is the linchpin of the section. Congress did not simply mention "franchises" in passing. *Tele-Communications, Inc. v. Commissioner,* 95 T.C. 495, 509 (1990), on appeal (10th Cir., May 20, 1991). Instead, Congress provided an expansive definition of "franchise" to "include" agreements to sell or distribute goods within a specified area. The word "includes" is not deemed to exclude other things otherwise within the meaning of the term defined. Sec. 7701(b).[5] There is no more persuasive evidence of Congress' intent than the words which it chose to express its wishes. *United States v. American Trucking Associations, Inc.,* 310 U.S. 534, 543 (1940). Thus, we read the word "franchise", as used in section 1253, broadly to mean "franchises" as that term is commonly understood, including any agreement which gives one party the right to distribute, sell, or provide goods, services, or facilities within a specified area. Sec. 1253(b)(1); *Tele-Communications, Inc. v. Commissioner, supra* at 509.

Respondent argues that section 1253 is ambiguous and that we must look to legislative history in order to ascertain its purpose. Respondent further argues that the legislative history indicates section 1253 was only intended to apply to private or "Dairy Queen"-type franchises.[6] We have recently held that section 1253 is not ambiguous, that it includes public franchises, and that such inclusion is not inconsistent with congressional intent. *Tele-Communications, Inc. v. Commissioner, supra* at 510. Nothing in the legislative history provides sufficient basis for concluding that Congress intended the more narrow interpretation argued by respondent.[7] *Tele-Communications, Inc. v. Commissioner, supra* at 512.

---

[5]The Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 138(a), 98 Stat. 672, amended sec. 7701 by redesignating subsec. (b) as subsec. (c).

[6]Respondent refers to these franchises as "Dairy Queen"-type franchises in reference to the line of cases which preceded the enactment of sec. 1253 and which involved Dairy Queen franchises. See *United States v. Wernentin,* 354 F.2d 757 (8th Cir. 1965); *Moberg v. Commissioner,* 310 F.2d 782 (9th Cir. 1962), revg. in part and affg. in part 35 T.C. 773 (1961); *Estate of Gowdey v. Commissioner,* 307 F.2d 816 (4th Cir. 1962), revg. T.C. Memo. 1961-112; *Moberg v. Commissioner,* 305 F.2d 800 (5th Cir. 1962), revg. 35 T.C. 773 (1961); *Dairy Queen of Oklahoma v. Commissioner,* 250 F.2d 503 (10th Cir. 1957), revg. 26 T.C. 61 (1956). During the course of this opinion, our reference to "Dairy Queen"-type franchises is used to denote the type of franchise to which respondent contends sec. 1253 applies.

[7]Respondent also argues that the retained powers requirement in sec. 1253(a) indicates that sec. 1253 only applies to private franchises because the retention of powers is only consistent with a

Our reading of section 1253(b)(1) to include more than the "Dairy Queen"-type franchise is buttressed by the fact that Congress specifically excluded professional sports franchises from the ambit of section 1253. Sec. 1253(e). The exclusion for professional sports franchises indicates that Congress was aware that the definition in section 1253(b)(1) encompassed more than the typical "Dairy Queen"-type franchise. If Congress had wanted to exclude other franchises that fell within the definition contained in section 1253(b)(1), we believe that it would have so provided. See *Tele-Communications, Inc. v. Commissioner, supra* at 510, 512, 514.

An FCC license is a "franchise" as that term is commonly understood.[8] The first definition of franchise in Black's Law Dictionary (6th ed. 1990) is: "A special privilege to do certain things conferred by government on individual or corporation, and which does not belong to citizens generally of common right; e.g., right granted to offer cable television service." The first relevant definition of franchise in Webster's Third New International Dictionary (1986) is:

a right or privilege conferred by grant from a sovereign or a government and vested in an individual or a group; *specif:* a right to do business conferred by a government * * * the right granted to an individual or group to market a company's goods or services in a particular territory. * * *

An FCC license satisfies the definition of franchise found in both dictionaries. It is a special privilege which does not belong to citizens generally of common right and which is conferred by the Government on an individual or corporation.

---

private franchise arrangement. This argument ignores the statutory structure of sec. 1253. Sec. 1253 requires a two-step analysis. First, we must determine if the interest transferred was a "franchise" as defined in sec. 1253(b)(1); then we determine whether a significant power was retained. Limiting the definition of "franchise" based on inferences from the retained powers requirement begs the question of whether the interest transferred is a "franchise" in the first place. *Tele-Communications, Inc. v. Commissioner,* 95 T.C. 495, 505-506 (1990), on appeal (10th Cir., May 20, 1991).

[8]"Where Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *NLRB v. Amax Coal Co.,* 453 U.S. 322, 329 (1981).

Specifically, it represents the right to engage in the broadcasting business.

An FCC license also satisfies the specific, nonexclusive, definition of "franchise" set out in section 1253(b)(1). An FCC license is an agreement between the Federal Government and the licensee under which the licensee agrees to provide the service of radio broadcasting within a specified area in exchange for the right to broadcast.

Respondent argues that there is no "agreement", within the meaning of section 1253(b)(1), because there is no consideration or bargained-for exchange. Respondent assumes "agreement" means "contract". However, an "agreement" is a broader term than "contract" and may lack an essential element of a contract. Black's Law Dictionary (6th ed. 1990). If Congress had intended to limit section 1253 only to contracts, it would have used that narrower term.

Clearly, an agreement is struck under which the FCC permits the licensee to broadcast in return for the licensee's promise to provide public service. The licensee seeks and is *"granted* the free and exclusive use of a limited and valuable part of the public domain; when he *accepts* that *franchise*[9] it is burdened by enforceable public obligations." *CBS, Inc. v. FCC,* 453 U.S. 367, 395 (1981) (emphasis added); *Central Florida Enterprises, Inc. v. FCC,* 683 F.2d 503, 507 (D.C. Cir. 1982); see *National Broadcasting Co. v. FCC,* 516 F.2d 1101, 1194 (D.C. Cir. 1974) (Tamm, J., concurring); *Office of Communication of United Church of Christ v. FCC,* 359 F.2d 994, 1003 (D.C. Cir. 1966). "Every licensee who is fortunate in obtaining a license is *mandated* to operate in the public interest and has *assumed the obligation* of presenting important public questions fairly and without bias." *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 383 (1969) (emphasis added); *Democratic National Committee v. FCC,* 460 F.2d 891, 900 (D.C. Cir. 1972); S. Rept. 562, 86th Cong., 1st Sess. 8-9 (1959).

Although consideration or bargained for exchange may not be required in order to have an agreement, we nevertheless note that these elements are present. For instance, it is

---

[9]We note that these courts describe the licensee's relationship with the FCC as a franchise. Although this language is arguably dicta, it nevertheless supports the conclusion that an FCC license is a "franchise" as that term is commonly understood.

beyond dispute that J-P Communications agreed to operate in the public interest in exchange for the FCC's consent to the assignment of the licenses.[10] This promise to provide public service in exchange for the public franchise constitutes consideration. See 37 C.J.S., Franchises, sec. 16 (1943). Indeed, respondent's own expert on FCC law, Michael Botein, in his report, states:

the broadcasters' quid for Congress' quo of [radio] spectrum usage was "public trustee" status—and the concomitant obligation to serve local listeners * * *. Congress required broadcasters to confer benefits upon members of the public, *not* upon the Commission or any government entity.

Respondent argues that an FCC license is merely a "unilateral grant of power by the government." However, the Government only agrees to let the licensee use the airways upon the licensee's agreement to comply with the conditions imposed by the FCC. This grant is no more unilateral than the typical commercial franchise agreement. The fact that a prospective licensee cannot negotiate over license terms is irrelevant. Even respondent's expert on commercial franchises acknowledged that the typical commercial franchisee must accept the franchisor's terms without alteration or not accept at all.[11] Thus, an FCC license meets the specific definition of franchise set out in section 1253(b)(1) because it is an agreement between the Federal Government and the licensee, under which the licensee agrees to provide the service of radio broadcasting within a specified area in exchange for the grant of the right to broadcast.[12]

Respondent argues that a trademark or trade name is the essence of a franchise agreement and that the absence of a trademark from an FCC licensing arrangement indicates that the arrangement is not a franchise arrangement. Section 1253(a) addresses the tax treatment of the "transfer of a franchise, trademark, *or* trade name". (Emphasis added.) If Congress intended that all franchising arrangements to which section 1253 applies must include a trademark or trade name,

---

[10]The FCC also imposed a $300,000 transfer fee with respect to the licenses transferred to J-P Communications. The FCC refunded this transfer fee to J-P Communications in 1980.

[11]See also *Tele-Communications, Inc. v. Commissioner, supra* at 511. (Respondent argued that a typical business franchise involved no negotiability on the part of the franchisee.)

[12]The parties do not dispute that an FCC broadcast license limits operations to a specified geographic area.

we think such a restriction would have been explicitly stated in the statute. This is especially true where Congress provided, without any limiting language, that "The term 'franchise' *includes* an agreement which gives one of the parties to the agreement the right to distribute, sell, or provide goods, services, or facilities, within a specified area." Sec. 1253(b)(1) (emphasis added).

Respondent argues that an FCC license is not a public franchise because the licensee obtains no property interest in the license. Even if we were to find this to be the case, petitioner would still be entitled to a deduction under section 1253(d)(2) because an FCC license satisfies the specific statutory definition of franchise found in section 1253(b)(1). *Tele-Communications, Inc. v. Commissioner,* 95 T.C. 495 (1990). However, assuming for the sake of argument that petitioner must also satisfy the common law definition of public franchise and further assuming that this requires a finding that an FCC license confers a property right, we would still find for petitioner.

An FCC license "is not a full-fledged, indefeasible property interest. But neither is it a non-protected interest, defeasible at will." *Orange Park Florida T.V., Inc. v. FCC,* 811 F.2d 664, 674 n.19 (D.C. Cir. 1987); *Reuters Ltd. v. FCC,* 781 F.2d 946, 950 n.5 (D.C. Cir. 1986); *L.B. Wilson, Inc. v. FCC,* 170 F.2d 793, 798, 802 (D.C. Cir. 1948); see *WJR, The Goodwill Station v. FCC,* 174 F.2d 226, 234 (D.C. Cir. 1948). A broadcast license confers a property right on its owner, although a limited and defeasible one. *L.B. Wilson, Inc. v. FCC, supra* at 802.[13]

The economic reality is that an FCC license represents a valuable asset to its holder. Because of technological limitations, only a limited number of FCC licenses may be assigned to a particular geographic region. *Metro Broadcasting, Inc. v. FCC,* 497 U.S. 547, 566, 110 S. Ct. 2997, 3010 (1990); *Red Lion Broadcasting v. FCC,* 395 U.S. 367, 375-377 (1969). Consequently, an FCC license represents the valuable right of entry into the broadcasting market for a particular area. FCC licenses are, subject to approval by the FCC, bought and sold.

---

[13]Respondent cites *FCC v. Sanders Bros. Radio Station,* 309 U.S. 470, 475 (1940), for the proposition that an FCC license confers no property interest. The above-cited cases upon which we rely all refer to *Sanders Bros.* when stating that although an FCC license is not a full-fledged property interest, neither is it a nonprotected interest, defeasible at will.

They are treated as an asset of a bankruptcy estate. *In re Fugazy Exp., Inc.,* 124 Bankr. 426, 430 (S.D.N.Y. 1991); see *In re Schnippel,* 121 Bankr. 784, 787 (Bankr. S.D. Ohio 1990).

In *Radio Station WBIR v. Commissioner,* 31 T.C. 803 (1959), we held that expenses incurred in connection with an FCC television license application were not deductible because "a television license is a capital asset of value" and "The expenditures involved were all made for the purpose of acquiring a capital asset." *Radio Station WBIR v. Commissioner, supra* at 813, 814. In *KWTX Broadcasting Co v. Commissioner,* 31 T.C. 952, affd. 272 F.2d 406 (5th Cir. 1959), we held that moneys paid to a third party to withdraw a competing application before the FCC were a capital expenditure for the acquisition of a television operating permit. *KWTX Broadcasting Co. v. Commissioner, supra* at 958. A capital asset is, by definition, property. Sec. 1221.[14]

An FCC license is a public franchise. *CBS, Inc. v. FCC,* 453 U.S. 367 (1981); *Central Florida Enterprises, Inc. v. FCC,* 683 F.2d 503 (D.C. Cir. 1982); *Office of Communication of United Church of Christ v. FCC,* 359 F.2d 994 (D.C. Cir. 1966).[15] It is a right to broadcast which is granted by the U.S. Government through its delegate, the FCC.[16] 47 U.S.C. secs. 301, 303 (1988). That right is essential to function as a broadcaster. J-P Communications could not lawfully engage in the business of broadcasting without the grant, and only the Government could grant this right.

We hold that an FCC license is a "franchise" within the meaning of section 1253.

---

[14]In Rev. Rul. 56-520, 1956-2 C.B. 170, respondent took the position that costs incurred in connection with obtaining FCC permission to use a particular broadcast frequency were a part of the cost basis of an asset of a permanent nature, and that the useful life of the asset (FCC license) is of an indeterminate duration. In support of this conclusion, the ruling invites the reader to compare *Coca-Cola Bottling Co. v. Commissioner,* 6 B.T.A. 1333 (1927). *Coca-Cola Bottling Co.* involves a private commercial franchise. In Rev. Rul 64-124, 1964-1 C.B. (Part 1) 105, respondent reiterated the position taken in Rev. Rul. 56-520, *supra.*

[15]A public franchise is a right or privilege granted by a sovereignty to one or more parties to do some act or acts which they could not perform without the grant of the sovereignty. *Bank of Augusta v. Earle,* 38 U.S. (13 Pet.) 519, 595 (1839). A right which is essential to the general function or purpose of the grantee, and which can only be granted by the sovereign alone, is a public franchise. *McPhee & McGinnity Co. v. Union Pac. R. Co.,* 158 F. 5, 10 (1907).

[16]It is generally recognized that the legislature may grant a franchise indirectly through its duly authorized administrative agency, and to this extent, the power to grant a franchise has frequently been delegated. 37 C.J.S., Franchises, sec. 14(c) (1943); see *Public Service Commission of Puerto Rico v. Havemeyer,* 296 U.S. 506 (1935).

## 2. The FCC Retained a Significant Power, Right, or Continuing Interest in the Subject Matter of the Franchise

Having established that an FCC license is a "franchise", we must now determine whether, for purposes of section 1253(a), the transfer of an FCC license is not to be "treated" as the sale or exchange of a capital asset. Under section 1253(a), if the FCC retained a significant power, right, or continuing interest in the subject matter of the license, the transaction is not treated as the sale of a capital asset. Section 1253(b)(2) states:

The term "significant power, right, or continuing interest" includes, but is not limited to, the following rights with respect to the interest transferred:
    (A) A right to disapprove any assignment of such interest * * *.
    (B) A right to terminate at will.
    (C) A right to prescribe the standards of quality of products used or sold, or of services furnished, and of the equipment and facilities used to promote such products or services.

Petitioner need only establish that the FCC retained one of these rights.[17] In this case, petitioner has established that the FCC retained the right to disapprove any assignment of the licenses and also retained the right to prescribe standards of quality for broadcasting services and for the equipment used to broadcast.

Section 310(d) of 47 U.S.C. (1988) states that an FCC license may not be "assigned, or disposed of in any manner * * * except upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby." A transfer may only be approved after an affirmative showing that the transfer will serve the public interest. 47 U.S.C. sec. 310(d) (1988); *Committee to Save WEAM v. FCC*, 808 F.2d 113, 116, 118 (D.C. Cir. 1986). The Federal Communications Act does not define "public interest", but the Supreme Court has characterized it as "a supple instrument for the exercise of discretion by the expert body which Congress has charged to carry out its legislative policy." *FCC v. Pottsville Broadcasting Co.*, 309 U.S. 134, 138 (1940). The FCC has broad discretion in determining whether a transfer will serve the public interest, and its determination is entitled to substantial judicial deference and

---

[17]We note that sec. 1253(b)(2) is a nonexclusive list.

should be followed unless there are compelling indications that it is wrong. *CBS, Inc. v. FCC,* 453 U.S. 367, 382, 390 (1981); *FCC v. WNCN Listeners Guild,* 450 U.S. 582, 594, 596, 598 (1981); *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381 (1969); *FCC v. WOKO, Inc.,* 329 U.S. 223, 229 (1946). The FCC's implementation of the public interest standard, when based on a rational weighing of competing policies, is not to be set aside by a reviewing court because Congress delegated the weighing of policies under this standard to the FCC in the first instance. *FCC v. National Citizens Committee for Broadcasting,* 436 U.S. 775, 803 (1978). Thus, the FCC exercises broad discretion in deciding whether to allow a proposed assignment, and the exercise of this discretion is entitled to substantial judicial deference. Under these circumstances, we find that the FCC has retained the power to disapprove license assignments.

Respondent argues the FCC has not retained the right to disapprove assignments because it rarely disapproves proposed assignments, and it exercises its discretion pro forma upon proper application for assignment. This argument assumes the FCC abrogates its responsibility of determining that the public interest is served by the assignment. We are unwilling to make such an assumption.[18] Applicants seeking FCC approval of a proposed assignment do so by filing an FCC Form 314, Application for Consent to Assignment of Broadcast Station Construction Permit or License. *Committee to Save WEAM v. FCC,* 808 F.2d 113, 118 (D.C. Cir. 1986). On this form, the applicant provides the FCC with information about its corporate structure, ownership, other media interest, and other information which the FCC considers relevant in determining whether to approve a proposed assignment. *Committee to Save WEAM v. FCC, supra* at 118. Except in certain circumstances, public notice of the proposed assignment is given, and any party in interest who opposes the assignment is given an opportunity to voice opposition. *Storer Communications, Inc. v. FCC,* 763 F.2d 436, 438 (D.C. Cir. 1985). The information sought on the Form 314 is extensive. Indeed, the part of the Form 314 for the assignment of the licenses to operate WQXI-AM, WQXI-FM,

---

[18]We note that on brief respondent states: "an FCC license is also personal to the licensee because it can only be transferred with permission of the FCC and the FCC *must examine* the transferee as if he were the original licensee." (Emphasis added.)

and KIMN-AM which was prepared by J-P Communications was over 250 pages long. The application contained extensive information on the local economy, public services, broadcasting and newspaper industries, and area demographics. J-P Communications interviewed 127 community leaders in the Denver area and 174 in the Atlanta area in order to ascertain community needs and interests as required by Form 314. We assume the FCC requests this information because it considers it relevant and that it considers this information when exercising its discretion on whether to approve an assignment. In light of this, we reject respondent's argument.

The FCC also retained the right to prescribe the standards of quality of services furnished and of the equipment used to promote such service as required by section 1253(b)(2)(C). The service provided is radio broadcasting. In 1974, the FCC required licensees to satisfy technical specifications which it prescribed to ensure satisfactory signal quality, promote safety, and prevent signal interference. 47 C.F.R. secs. 39-99, 250-333 (1974). The FCC also required licensees to broadcast a minimum number of hours each day, 47 C.F.R. secs. 73.71, 73.261 (1974), prohibited broadcasting for consideration without disclosure, 47 U.S.C. sec. 317(a)(1) (1988); 47 C.F.R. secs. 73.119, 73.289 (1974); 47 C.F.R. sec. 73.1212 (1975), and required that candidates for public office receive equal access to broadcast media, 47 C.F.R. sec. 73.120 (1974). Indeed, the FCC, short of abridgement of free speech, free press, and censorship, was free to implement requirements such as equal access to broadcasting for candidates for public office and equal time for countervailing views on public issues in order to properly discharge its duty of promoting the public interest. *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 382 (1969); see also 47 C.F.R. sec. 73.120-73.125 (1974). Thus, the FCC has also retained the right to prescribe standards for the quality of the services provided and the equipment used and it exercises this right. Although these standards may not be as specific as the standards sometimes used in a private franchise agreement, they nevertheless are mandatory, and failure to comply with them could result in revocation of the license.

Respondent argues that most stations would have operated within these minimum requirements regardless of the FCC's

specifications.  Even if this were true,[19] we would still find that the FCC has retained the right to prescribe the standards of quality of services furnished and equipment used.  The uncontroverted fact is that the FCC prescribes minimum standards, and licensees are required to comply with them or face possible revocation of their license.  See, e.g., *CBS, Inc. v. FCC,* 453 U.S. 367, 378 (1981) (suggesting that one violation of the reasonable access rule of 47 U.S.C. sec. 312(a)(7) (1988) could result in license revocation).  Respondent's position would require a franchisor to exercise its retained rights in such a way as to prove onerous to the franchisee in order for them to qualify as retained rights under section 1253(b)(2)(C).  We do not read section 1253(b)(2)(C) to require this.  We hold that the FCC has retained an interest in the subject matter of the franchise.  Accordingly, under section 1253(a), the transfer is not treated as the sale or exchange of a capital asset, and petitioner is therefore entitled to ratably deduct the cost of the licenses pursuant to section 1253(d)(2)(A).

In order to determine the amount of the deduction under section 1253(d)(2), we must value the FCC licenses.  Valuation issues present questions of fact that can only be resolved by weighing all the evidence.  *885 Investment Co. v. Commissioner,* 95 T.C. 156, 166-167 (1990); *Stanley Works v. Commissioner,* 87 T.C. 389, 408 (1986).  The process is inherently imprecise, *Messing v. Commissioner,* 48 T.C. 502, 512 (1967), and this Court has admonished parties in the past for not settling issues of valuation.  See *Buffalo Tool & Die Manufacturing Co. v. Commissioner,* 74 T.C. 441, 451 (1980).

Petitioner argues that the values for the FCC licenses for stations WQXI-AM, WQXI-FM, and KIMN-AM are $2,090,000, $1,440,000, and $1,892,000, respectively.  Respondent argues that the licenses have no independent value because, standing alone, they are incapable of producing income.  Both parties rely heavily on expert opinion to support their positions on the value of the FCC broadcast licenses.  We evaluate such opinions in light of the demonstrated qualifications of the expert and all other evidence of value.  *Estate of Newhouse v. Commissioner,* 94 T.C. 193, 217 (1990); *Parker v. Commissioner,* 86 T.C. 547, 561 (1986); *Johnson v. Commissioner,* 85 T.C. 469, 477 (1985).

---

[19]We do not find that this is true.

We are not bound, however, by the opinion of any expert witness when that opinion is contrary to our judgment. *Estate of Newhouse v. Commissioner, supra* at 217; *Parker v. Commissioner, supra* at 561. We take expert opinion testimony into account to the extent it aids us in arriving at the fair market value of the FCC licenses. We may accept or reject the opinion of an expert in its entirety. *Buffalo Tool & Die Manufacturing Co. v. Commissioner, supra* at 452.

Petitioner relies primarily on the valuation reports prepared by Broadcast Investment Analysts, Inc. (BIA), and the testimony of its vice president, John Intrater. We found Mr. Intrater to be a convincing and believable witness. Mr. Intrater has been involved in the appraisal of over 700 communication properties, and his qualifications as an expert on the value of broadcast properties were unmatched by any of respondent's witnesses.

The BIA reports value the FCC licenses by determining the anticipated cash-flow from operating a hypothetical startup station over 9 years and the anticipated proceeds on the sale of the station in year 9. These amounts were then discounted using a discount factor of 14 percent. Mr. Intrater used a 9-year period because, based on his experience, a typical purchaser held a radio station for 9 years. Mr. Intrater used a hypothetical new station in an effort to exclude goodwill and going concern value from the valuation. This methodology assumes that a new station does not have any goodwill or going concern value.

To determine the amount of cash-flow to discount to present value, Mr. Intrater projected future radio revenues for a hypothetical new station in the Atlanta and Smyrna, Georgia, and Denver, Colorado, markets over a 9-year period beginning in 1974. These projections are based on information which would have been available to a buyer in 1974. Mr. Intrater began his analysis by projecting the anticipated yearly revenues generated by all comparable stations in the Atlanta and Denver markets for each of the 9 years used in the discounted cash-flow analysis.[20] Next, Mr. Intrater deter-

---

[20]These projected earnings for all comparable stations are based on earnings during the years 1970-73. The analysis assumes a growth rate consistent with the growth rate in the markets during 1970-73 and then factors in an increase to reflect external factors not present during 1970-73 and which were expected to further increase radio earnings.

mined the average market share for stations within the group of comparable stations being examined for purposes of the valuation. Mr. Intrater assumed the hypothetical station would perform at the industry average and command the average market share by its third year of operation.[21]

Once Mr. Intrater determined the hypothetical station's anticipated market share, he multiplied the market share percentage against total projected market revenues for the year to arrive at the station's anticipated gross revenues for the year. The gross revenues for each year were decreased to reflect anticipated expenses to arrive at the hypothetical station's projected cash-flow from operations for the years 1974 through 1983. These revenue projections were then discounted by a factor of 14 percent.[22] The discounted cash-flows for each of the years were totaled, and this total, according to Mr. Intrater, represents the present value of the anticipated cash-flow that a hypothetical buyer of a startup radio station, similar to the ones purchased by J-P Communications, could expect to receive from the purchase of an FCC license. Mr. Intrater then added to this figure the present value of the projected net proceeds from the sale of the station during its ninth year of operation.[23] Mr. Intrater reduced the sum of the two discounted figures by the cost of constructing the station to arrive at the price that a hypothetical buyer of FCC licenses, similar to the ones purchased by J-P Communications, would pay.

Respondent argues that valuations based on a hypothetical business are erroneous, citing *UFE, Inc. v. Commissioner,* 92 T.C. 1314 (1989). Respondent's reliance on *UFE, Inc.* is misplaced. In *UFE, Inc.,* the Court rejected an expert's valuation since the expert's assumptions were based on "pure conjecture". *UFE, Inc. v. Commissioner, supra* at 1328. By contrast, the assumptions in the BIA reports are based on

---

[21]This assumption is based on Mr. Intrater's experience that it takes, on average, 3 years to turn a station around. Mr. Intrater attributed a less-than-average market share to the station during the first 2 years of operation.

[22]Mr. Intrater testified that this figure was twice the rate for T-bills in 1974 and was used to reflect the potential risk of investing in a radio station.

[23]Mr. Intrater assumed that a subsequent purchaser would pay nine times the station's operating profit at the time of sale. This assumption is based on information provided by radio brokers. The net sale proceeds also reflects various transaction costs.

quantitative data or Mr. Intrater's experience as a broadcast property appraiser.[24]

Respondent did not make any attempt to assign a specific value to the licenses other than zero. Indeed, respondent argues that a license has no independent value because, standing alone, it is incapable of producing income. Respondent's position is that an FCC license is incapable of valuation separate and apart from goodwill. The capability of an FCC license to produce income is no more dependent on goodwill and other assets than any other franchise. As with all franchises, the FCC license, standing alone, produces no income. It is only after the license or other franchise rights are combined with other assets that income is generated. Courts have recognized that, even though the mere possession of an FCC license does not guarantee the realization of profit, the license can have substantial value. See *Miami Valley Broadcasting Corp. v. United States,* 204 Ct. Cl. 582, 499 F.2d 677, 688-689 (1974); *Meredith Broadcasting Co. v. United States,* 186 Ct. Cl. 1, 405 F.2d 1214, 1228-1229 (1968); *Roy H. Park Broadcasting, Inc. v. Commissioner,* 56 T.C. 784, 812 (1971).[25]

Respondent's position is also inconsistent with Rev. Rul. 88-24, 1988-1 C.B. 306, and section 1.1253-1(d), Proposed Income Tax Regs., 36 Fed. Reg. 13151 (July 15, 1971). Rev. Rul. 88-24 deals with the transfer of franchise rights incident to the sale of an ongoing business. Presumably, these franchise rights, standing alone, were incapable of producing income. Nevertheless, Rev. Rul. 88-24, *supra,* permitted valuation of the

---

[24]Respondent also cites *Forward Communications Corp. v. United States,* 221 Ct. Cl. 582, 608 F.2d 485 (1979); *Miami Valley Broadcasting Corp. v. United States,* 204 Ct. Cl. 582, 499 F.2d 677 (1974); and *Meredith Broadcasting Co. v. United States,* 186 Ct. Cl. 1, 405 F.2d 1214 (1968), for the proposition that it is improper to value an FCC license based on the capitalized earnings of a hypothetical station. Respondent's basic position appears to be that, because the court in those cases did not evaluate the license based on a hypothetical startup station, such a valuation is erroneous. However, in none of these cases is there any indication that the court considered the capitalized earnings of a hypothetical startup station in order to ascertain the value of an FCC license. Indeed, in *Forward Communications* and *Meredith Broadcasting,* the court found that it was not even necessary to value the FCC license separate from other intangible assets.

[25]Ironically, in *Roy H. Park Broadcasting, Inc. v. Commissioner,* 56 T.C. 784 (1971), and *Meredith Broadcasting Co. v. United States, supra,* respondent argued that the residual value of all intangibles was properly included in the value of the FCC broadcasting license. Respondent's reply brief addresses this apparent inconsistency by noting that FCC licenses were not amortizable under prior case law and, therefore, it was in respondent's interest to argue that a large allocation should be attributed to the FCC licenses.

franchise rights and allowed a deduction of a ratable portion of the purchase price attributable to the transfer of the franchise rights. Similarly, in *Example 1* of section 1.1253-1(d)(2), Proposed Income Tax Regs., *supra,* use of a trade name (which presumably was incapable of producing income standing alone) was transferred incident to the sale of an ongoing business. A separate value was allocated to the right to use the trade name.[26]

Respondent relies on *Forward Communications, Inc. v. United States,* 221 Ct. Cl. 582, 608 F.2d 485 (1979), for her position that an FCC license has no value separate and apart from goodwill. *Forward Communications* does not support this position. The issue before the court in *Forward Communications* was whether the taxpayer could depreciate a television broadcast license over a claimed useful life of 3 years. The court held that the license had no determinable useful life and, therefore, was not depreciable under section 167. *Forward Communications, Inc. v. United States, supra* at 494. The parties apparently did not contest the issue of whether the license had a value separate and apart from goodwill. *Forward Communications, Inc. v. United States, supra* at 496. The court concluded that:

> In view of the determination that the license may not be depreciated or amortized and the failure of the parties here to demonstrate that it is necessary to place a separate value on the license as an aid in ascertaining the value of any other asset, there appears to be no necessity for finding an independent value herein. * * * [*Forward Communications, Inc. v. United States, supra* at 497.]

Respondent's argument that an FCC license has no value separate and apart from goodwill does not withstand logical

---

[26]Rev. Rul. 57-377, 1957-2 C.B. 146, also suggests that respondent's official position is that an FCC license may be valued separate from goodwill. The issue in Rev. Rul. 57-377 was whether a purchaser of a television station could depreciate a network affiliation contract and national spot advertising contracts. In Rev. Rul. 57-377, the purchaser allocated the entire purchase price among physical assets, goodwill, local and national advertising contracts, and a network affiliation contract. The ruling states that "One of the assets acquired in the purchase is a television broadcasting license." The revenue ruling criticizes the taxpayer's failure to allocate a portion of the purchase price to the FCC license stating:

The foregoing allocation by the corporation reflects no value for the Federal Communications Commission license to broadcast. In this connection, see Rev. Rul. 56-520, C.B. 1956-2, 170, in which it is held that the expenditures incurred by a taxpayer to obtain permission from Federal Communications Commission to operate a television broadcasting station on a certain channel constitute capital expenditures * * *. [Rev. Rul. 57-377, 1957-2 C.B. at 147.]

analysis. For example, a hypothetical purchaser of a station who wanted to change the format and hire a new staff would probably pay little, if anything, for goodwill. This is because the change in format would attract new listeners, and the old listeners would find a new station whose format was similar to the one they listened to before the purchase. Similarly, many of the station's sponsors would advertise on other stations whose formats target their consumers. Goodwill would be of little value to this purchaser. The same would be true of a station that had not generated any profits in previous years. A prospective purchaser would probably pay very little for the goodwill associated with such a station. In arriving at a purchase price, this purchaser would probably determine the value of the station's tangible assets and then place a value on the right to enter into the business of broadcasting. See *Meredith Broadcasting Co. v. United States, supra* at 1228. The simple fact is that an FCC license represents a limited right to engage in the business of broadcasting that can be valued separate from goodwill.

Respondent's remaining attacks on the BIA reports, in the aggregate, provide an insufficient basis for discounting the value reached therein. Respondent adhered to the position that the FCC license had no value separate and apart from goodwill and failed to provide a specific alternative value other than zero. After reviewing all the expert testimony and reports in this case, we adopt the values reflected in the BIA reports.

Finally, respondent argues that the deductibility requirements of section 1253(d) cannot be met by attributing a portion of the total purchase price to the FCC licenses because in order to be deductible under section 1253(d), the payment for the franchise must be made in discharge of a principal sum agreed-upon in the transfer agreement. Respondent argues that petitioner fails to meet this requirement because the agreement between J-P Communications and Pacific & Southern Co. does not specify the sales price of the FCC licenses.

The agreement between J-P Communications and Pacific & Southern Co. specifically identified the FCC licenses as assets which were to be transferred pursuant to the agreement. The agreement also required Pacific & Southern Co. to keep the

licenses current and required FCC consent to the transfer of the licenses as a condition precedent to the closing of the sale. The agreed upon purchase price was $15 million. Clearly, the FCC licenses were assets which both buyer and seller knew were being transferred pursuant to the agreement. Some portion of the $15 million in the agreement represents consideration for the transfer of the licenses. Although it is unclear from the contractual terms what specific amount should be allocated to the FCC licenses, some allocation is surely necessary. See *Peterson Machine Tool, Inc. v. Commissioner,* 79 T.C. 72, 82 (1982), affd. without published opinion (10th Cir. 1984). Indeed, we have previously determined the value of a public franchise for purposes of section 1253 by allocating part of the total purchase price to the franchise. See *Tele-Communications, Inc. v. Commissioner,* 95 T.C. 495, 523-525 (1990), on appeal (10th Cir., May 20, 1991).

Respondent's position is inconsistent with section 1.1253-1(d), Proposed Income Tax Regs., 36 Fed. Reg. 13151 (July 15, 1971) and Rev. Rul. 88-24, 1988-1 C.B. 306. Section 1.1253-1(d)(1), Proposed Income Tax Regs., states that in connection with the sale of a trade or business, the amount deductible under section 1253 "is to be determined on the basis of the facts and circumstances involved in each case, including any written agreement entered into by the parties". Section 1.1253-1(d)(1), Proposed Income Tax Regs., *supra,* also states that to the extent the purchase price is not attributable to specific tangible assets, the purchase price must be allocated on a reasonable basis among the intangible assets transferred, including any franchise rights. See sec. 1.1253-1(d)(2), *Example (1),* Proposed Income Tax Regs, *supra.*

Rev. Rul. 88-24, 1988-1 C.B. 306, involves facts similar to those in section 1.1253-1(d)(2), *Example (1),* Proposed Income Tax Regs., *supra,* i.e., the sale of an ongoing business, including franchise rights and other intangibles, for which there is no separately stated principal sum agreed upon for the transfer of the franchise rights. Rev. Rul. 88-24, *supra,* states that the taxpayer is entitled to amortize the portion of the purchase price attributable to the acquisition of the franchise rights. The ruling permits a post hoc allocation of the purchase price in order to determine the amount which may be amortized under section 1253(d)(2). Petitioner's post hoc

allocation of the $15 million purchase price in the instant case is entirely consistent with Rev. Rul. 88-24, *supra.*

We adopt the values assigned to the FCC licenses in the BIA reports and hold that petitioner is entitled to amortize those amounts pursuant to section 1253(d)(2).

*Decision will be entered under Rule 155.*