W. H. BRAUM FAMILY PARTNERSHIP, W. H. BRAUM, TAX MATTERS PARTNER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent W. H. Braum Family Partnership v. Commissioner
Docket Nos. 25898-90, 28780-90, 28782-90, 28785-90, 28786-90, 28789-90, 28791-90, 28792-90, 28793-90, 13163-91, 13219-91
United States Tax Court
T.C. Memo 1993-434; 1993 Tax Ct. Memo LEXIS 449; 66 T.C.M. (CCH) 780; September 20, 1993, Filed Decision will be entered under Rule 155. For petitioners: Kenneth N. McKinney, Robert O. O'Bannon, N. Martin Stringer, and Philip L. Salvage. For respondent: David Hendricks and Osmun Latrobe. JACOBS
JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: Respondent determined the following income and gift tax deficiencies and additions to tax: Type of
Petitioners
Tax
Year
Deficiency
W. H. Braum, Inc.
Income
1985
$ 604,667
Income
1986
423,628
Braum Ice Cream Stores,
Income
1983
288,160
Inc. and Subsidiary Income
1984
465,282
William H. and Mary E.
Gift
1984
2,037,361
Braum Income
1984
7,185,630
Income
1985
483,286
Income
1986
539,472
Income
1987
198,072
Elaine M. Braum
Income
1984
3,534
Income
1985
2,580
Income
1987
2,428
Joel R. and Rebecca A.
Income
1984
3,285
Hersh Income
1985
2,529
Rebecca A. Hersh
Income
1987
3,287
Drew M. and Deborah A.
Income
1984
3,475
Braum Income
1985
2,583
Income
1987
2,428
Murray G. and Jeanne G.
Income
1984
2,769
Braum Income
1985
2,799
Income
1987
2,427
Additions to Tax
Sec.
Sec.
Sec.
Petitioners
6653(a)(1)
6653(a)(2)
6661(a)
W. H. Braum, Inc.
--
--
$ 149,700
--
--
107,168
Braum Ice Cream Stores,
--
--
72,040
Inc. and Subsidiary --
--
112,542
William H. and Mary E.
$ 101,868
To be
--
Braum determined
--
--
1,755,183
--
--
120,822
--
--
134,868
--
--
49,319
Elaine M. Braum
--
--
--
--
--
--
--
--
--
--
--
--
Joel R. and Rebecca A.
--
--
--
Hersh --
--
--
Rebecca A. Hersh
--
--
--
Drew M. and Deborah A.
--
--
--
Braum --
--
--
--
--
--
Murray G. and Jeanne G.
--
--
--
Braum --
--
--
--
--
--
*450 All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts have been rounded. These cases have been consolidated due to the relationship of the petitioners and the continuity of the facts involved. For purposes herein, the individual petitioners are referred to by their first names; Braum Ice Cream Stores, Inc. and Subsidiary, which in 1985 was renamed W. H. Braum, Inc., as the Corporation; [2] and W. H. Braum Family Partnership as the Partnership. William and Mary are husband and wife; Rebecca, Elaine, Murray, and Drew are their children. William owns all the outstanding stock of the Corporation. The Corporation operates more than 200 retail stores which sell a variety of prepackaged dairy products (milk, ice cream, yogurt, and cottage cheese), bakery products, fast food items, and soda fountain *451 products (sundaes, banana splits, and milkshakes). The Corporation is vertically integrated. It raises, grows, produces, manufactures, or processes virtually all items sold in its retail stores. It raises the cows necessary to produce the milk used in the dairy products sold and grows the hay and alfalfa needed to feed the cows. It operates the plant which processes the milk and ice cream, manufactures the containers (milk containers, ice cream cartons, and plastic banana split and sundae dishes) used in packaging the products sold, and bakes the ice cream cones, as well as hamburger rolls, breads, and cookies, sold in its stores. In connection with its operations during the years at issue, the Corporation leased more than 23,000 acres of land, identified in 21 parcels, from William, individually, and the Partnership. The partners of the Partnership are William, Mary, and their four children. The parties have been able to resolve many of their differences through concessions which are set forth in a stipulation of facts. The primary unresolved dispute centers on respondent's disallowance of a portion of the rental payments by the Corporation to William and the Partnership. *452 Respondent contends that the rental payments exceeded the fair rental value of the leased property as follows: 1984
1985
1986
1987
$ 774,434
$ 1,063,669
$ 1,048,326
$ 986,000
Respondent further determined that a portion of the perceived excess rental payments constitutes a constructive dividend from the Corporation to William, and that William and Mary made joint gifts to their children in an amount equal to the deemed constructive dividend. The Corporation and the individual petitioners dispute these determinations. We hold that the amounts of rents paid by the Corporation to William and the Partnership were not excessive and are deductible as claimed. Another unresolved dispute, involving gift tax liability, concerns the taxable year (1983 or 1984) in which certain gifts from William and Mary to their children are deemed to have occurred. [3] The gifts were made through checks (totaling $ 57,436) dated December 31, 1983, which cleared William's bank on January 11, 1984. Respondent determined the gifts occurred in 1984; William and Mary contend the gifts occurred in 1983. We hold for respondent. *453 The remaining unresolved disputes concern additions to tax as follows: (1) Respondent determined that William and Mary and the Corporation are liable for the addition to tax under section 6661 with respect to the aforementioned rent issue. As a result of our holding with respect to the rent issue, the section 6661 addition to tax relating thereto falls by the wayside. (2) Respondent determined that the Corporation is liable for the addition to tax under section 6661 with respect to a claimed duplicate depreciation deduction. We hold for respondent. (3) Respondent determined that William and Mary are liable for additions to tax under section 6653 with respect to the aforementioned gift tax issue. We hold that William and Mary are not liable for the section 6653 additions to tax. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of facts and attached exhibits are incorporated herein by this reference. On the dates the petitions were filed, Joel resided in Arkansas; each of the other individual petitioners resided in Oklahoma. The Corporation and Partnership had their respective principal places of business in Oklahoma. I. Rent
*454 A. Business Background
William began working in his father's ice cream business (located in Kansas) from its inception in 1940, at which time he was 12 years old. In 1952, William's father sold the wholesale side of the business, but continued the retail operations in rented storefronts. In 1957, William bought his father's retail ice cream business. At that time, the business had annual sales of approximately $ 400,000, and annual profits between $ 10,000 and $ 15,000. He operated the business under the name Peter Pan. During the next 10 years, William aggressively expanded the business by bringing in investors who agreed to build and lease to William freestanding stores for a fixed return on their investments. At the end of 10 years, sales of the business rose to approximately $ 4 million a year. William attempted to buy fresh milk for his ice cream mix from farmers but found that source of supply to be unreliable. Consequently, in 1961, he bought a 910-acre dairy farm outside Emporia, Kansas (the Emporia farm). He began with 1,000 cows. (At that time the average dairy farm had 40 cows.) William bought additional land, increasing the size of the Emporia farm to *455 2,000 acres. In 1967, William sold his retail ice cream business to Stefan Food of Wichita, Kansas, a large independent wholesaler, for $ 1,250,000. The processing plant and the Emporia farm were not included in the sale. As a condition of the sale, William agreed not to operate retail ice cream stores in Kansas for 10 years. William and Mary moved to Oklahoma in order to operate the ice cream business, and the Corporation was then organized. The first Oklahoma stores were opened in March of 1968. William again found third parties willing to build and lease stores to the Corporation. The negotiated return to the investor was 10 percent on the cost of the land and 12 percent on building costs. From 1968 through 1971, William individually continued to operate the dairy and processing plant in Emporia; he shipped ice cream and other dairy products daily from Emporia to the Oklahoma stores. By 1971, there were 37 stores in Oklahoma. In 1971, William determined that it would be desirable for the Corporation to own its own retail outlets. Accordingly, a corporation, Retail Building, Inc. (RBI), was organized to build retail outlets and lease them to the Corporation. Initially, *456 20 percent of RBI stock was owned by the bank which provided the financing to build the stores; the remainder was owned by William and certain employees of the Corporation. By April 1984, William, Mary, and their children owned all the stock of RBI, as follows: William and Mary each owned 18 percent of RBI's stock, and each child owned 16 percent. Mary and the children acquired their stock interests in RBI through gift funds from William. By that time, the Corporation had transferred all retail stores owned by it to RBI. In 1971, the Corporation acquired property in Oklahoma City on which it built a processing plant. Thereafter, all of the ice cream and related products were processed and manufactured in Oklahoma City; milk continued to be transported from the Emporia farm, 280 miles away. William leased the Emporia farm to the Corporation for an amount sufficient to cover his debt service (principal and interest) on the funds which he had borrowed to buy the farmland. During 1974, William began a search to acquire Oklahoma farmland of at least 1,000 acres in order to move the dairy operation and cows from the Emporia farm. (He was under the impression that corporations were *457 restricted under Oklahoma law in owning farmland.) He ultimately found 2,240 acres near Tuttle, Oklahoma (the first Tuttle parcel). He purchased the first Tuttle parcel for $ 1,300,000 in March 1975, and moved the Emporia farm dairy operation by the end of that year. In 1975 and 1980, William had acquired additional parcels at a total cost of $ 847,000, increasing the land at Tuttle (the Tuttle Farm) to about 3,000 acres, which was rented to the Corporation for $ 384,708 per year. Again, the rent paid by the Corporation for the Tuttle Farm was determined on the basis of the amount required to cover William's debt service on funds borrowed to acquire the parcels. The Corporation attempted to raise replacement animals at the Tuttle Farm, but this caused overcrowding and an "odor problem". As a result, William determined additional land was needed to raise the replacement animals. On August 1, 1983, the Partnership was formed. William and Mary wanted their children to be involved in the business. Accordingly, Rebecca, Elaine, Murray, and Drew each became a general partner in the Partnership, as well as a shareholder in RBI, the entities which leased land and stores to the Corporation. *458 William and Mary each owned an 18-percent partnership interest in the Partnership, and each child owned a 16-percent partnership interest. These percentage interests were selected in order to place control in the hands of William, Mary, and one child, or alternatively, in the hands of all four children. The children acquired their interests in the Partnership with funds given to them by William. From October of 1983 through September of 1986, the Partnership acquired 18 parcels of land, varying in size from 50 to 4,640 acres (the Partnership properties), at prices ranging from $ 37,500 to $ 1,900,000. The Partnership properties consisted of six farms at separate locations: (1) Asher Farm, 3,420 acres; (2) Tuttle Farm, about 6,330 acres (including 3,330 acres from the Partnership properties); (3) Rosedale Farm 1,060 acres; (4) Stonewall Farm, 3,965 acres; (5) Shattuck Farm, 6,744 acres; and (6) Wanette Farm, 1,800 acres. William negotiated the purchases and arranged the financing for the purchases of the Partnership properties. The Corporation and RBI guaranteed the Partnership loans. The Corporation purchased the movable equipment (such as trucks and tractors), and the Partnership *459 purchased the buildings and improvements. [4] William believed the Corporation's borrowing of money to acquire the Partnership properties would have adversely affected its financial ratios, by making it overleveraged, and thus, increased its borrowing costs. The Partnership rented the Partnership properties to the Corporation for the following annual amounts: Year
Amount
1984
$ 883,335  1985
1,257,527
1986
1,282,776
1987
1,275,024
The Corporation did not enter into written leases for the Partnership properties. The rentals were determined as a result of family discussions. The amount paid by the Corporation as rent was determined on a "total needs basis", that is, the amount necessary to cover the debt service plus a "minimal" return on the investment. The Partnership properties were leased on a "triple net" basis, with the Corporation paying all related expenses, including real estate taxes. The *460 Corporation demolished certain improvements on the Rosedale and Asher Farms, and used a barn at the Stonewall Farm as an office and for storage of hay and pecan harvesting equipment. The Corporation made extensive, costly improvements to the Partnership properties. [5] Although there was no written agreement regarding leasehold improvements made by the Corporation, it was understood that the improvements would revert to the lessor if the leases terminated. The Corporation owned approximately 15,000 cows by 1987. In order to maximize milk production, a portion of the cows' diet consisted of high quality silage, hay, or alfalfa. The Corporation decided that the best way to control alfalfa quality and supply at reasonable cost was to grow its own. By 1987, the corporate *461 headquarters and a plant for processing milk and related dairy products were located at the Tuttle Farm. The Tuttle Farm had the capacity to handle over 5,000 cows, each of which was milked three times a day (a rate of 720 cows per hour). The milk went into 6,000-gallon storage tanks and was then processed. In 1987, the Corporation built a 200,000-square-foot plant to process all milk, ice cream, and related dairy products sold in its retail stores; later, a 60,000-square-foot addition was constructed. The Corporation also converted part of the Tuttle Farm, which had been used for growing corn, to Bermuda pasture so that the cows could graze during the 2 months per year when they were "dry". [6] The water flush system at the Tuttle Farm, which flushed waste from corrals every 8 hours, required at least 300 gallons a minute, 24 hours a day, 7 days a week. This untreated water was obtained from lakes and wells at the Tuttle Farm. (Treated water is required for the milking operations, washing cows, the plant, and the people working there.) Disposal of animal waste is a substantial problem. The large size of the Tuttle Farm makes it advantageous for waste disposal. *462 The Asher Farm land was purchased to alleviate overcrowding at the Tuttle Farm. Calves were born and raised at the Tuttle Farm. When the calves weighed between 200 and 250 pounds, they were moved to the Asher Farm. The Asher Farm land was purchased in a substantially improved condition with extensive grading, roads, cattle guards, lakes, and working pens. There were irrigated pastures on which the cattle were rotated; the young cows grazed for 6 months on Bermuda grass and 2 months on overseeded wheat. The young cows were raised at the Asher Farm until they weighed 800 pounds, when they were artificially inseminated. The Corporation leased about 110 acres from a party named Johnson (the Johnson Leased Land) to provide access between two parts of the Asher Farm. The Johnson Leased Land was in "pretty rough" condition and the lessor retained certain rights, such as fishing and hunting. The Rosedale Farm land was originally purchased to grow alfalfa, but by 1992 was converted to improved pasture for grazing. The Stonewall Farm land was acquired in substantially improved condition with a large barn, a concrete feedlot, and three houses. The Stonewall Farm was used to keep bulls *463 and artificially inseminated heifers of 800 pounds or more; there was medical treatment available for the cows. There were also about 3,000 pecan trees, which were harvested; [7] the pecans were used as an ingredient in the ice cream. The Shattuck Farm, located on the western edge of Oklahoma and in Texas, included about 6,000 acres by 1987. The combination of the very dry climate and irrigated circles made growing alfalfa its primary use. There were substantial improvements made by the prior owner, including leveling of the land and installation of irrigation pivots. There was an excellent supply of subsurface well water, making the Shattuck Farm land ideal for growing alfalfa. From a safety and efficiency standpoint, the large size of the Shattuck Farm was beneficial because large equipment (swathers) used to harvest the alfalfa *464 could be moved from field to field without crossing a road. The Corporation leased about 2,400 acres in the middle of the Shattuck Farm from a Mrs. Squires (the Squires Leased Land). The annual rent was about $ 19,000 to $ 20,000 and the Corporation agreed to pay for irrigation pivots and a feed lot to obtain the lease. Some of the Squires Leased Land was very rough and the lessor retained hunting privileges. The Wanette Farm land was purchased to grow alfalfa. The Corporation installed a half-mile-long pivot irrigation system, which sprayed 4,000 gallons of water per minute from a creek located on the farm, to water a square mile of alfalfa. By 1990, the Corporation had become a vertically integrated "agribusiness", which leased land to produce the raw materials used in manufacturing and processing the products sold in its retail stores. Thus, the leased properties were an integral part of the corporation's operations. By 1992, all four of William and Mary's children were fulltime employees of the Corporation. Rebecca supervised two employees engaged in finding suitable locations on which to build stores, and decided which to acquire. From 1989 through at least 1992, Elaine *465 worked as William's assistant and executive secretary. Murray supervised farming operations on the outlying farms, excluding the Tuttle Farm. After college, Drew worked on the farms; when the new plant was built at the Tuttle Farm, he worked as plant supervisor, and in 1992, was division manager of the retail stores. For fiscal years 1984 through 1987, the unappropriated retained earnings and distributions of the Corporation shown on the Schedules M attached to the Corporation's tax returns were as follows: 1984
1985
1986
1987
Retained earnings
$ 15,902,858
$ 19,122,130
$ 21,530,649
$ 24,034,470
Distributions
26,065
200,244
--  --  Dividend distributions as a percentage of net income were .57 percent for 1984, 5.85 percent for 1985, and 1.75 percent for the years 1984 through 1987. On its Federal income tax returns for fiscal years 1984, 1985, 1986, and 1987, the Corporation deducted rents totaling $ 6,243,298, $ 9,010,368, $ 8,967,790, and $ 9,775,163, respectively; no statements of explanation or underlying detail were provided. As stated previously, respondent disallowed a portion of the claimed rental deduction. The basis of respondent's disallowance *466 was that the rents with respect to the properties leased from William and the Partnership properties (collectively, the subject properties) were "in excess of those amounts required to be made as a condition to the continued possession of farmland property for purposes of the [Corporation's] trade or business". B. Expert Evidence
1. Petitioners
a. C. Dwain Bearden
Petitioners presented the report and testimony of C. Dwain Bearden (Bearden), a real estate appraiser with an office 25 miles from Tuttle, Oklahoma, and at least 28 years' experience. Since 1988, he has spent 50 percent of his time valuing agricultural properties. He has held offices in the Society of Real Estate Appraisers and the American Institute of Real Estate Appraisers and taught appraisal courses. Bearden testified that there were no rental comparables which could be used to determine a fair market rental for the subject properties. Therefore, he used the investment analysis method and determined the rent which would be charged by a knowledgeable investor who would acquire the subject properties for the purpose of leasing them to the Corporation on a long-term basis. Bearden first estimated *467 the market value of the land. He assumed the highest and best use of the subject properties was a dairy operation like that of the Corporation. Bearden examined each parcel individually. He analyzed the number of acres of the various soil types present on each of the six farms (e.g., Bermuda grass pasture, or irrigated or dry cropland) and designated the acreage between class I for the best soil through class VIII for the least productive soil. He then selected 13 sales of Oklahoma land occurring between 1983 and 1987 and ranging from 86.72 to 4,716 acres. From the sales, he estimated a sales price per acre for each class of soil and multiplied it by the acres of that class on each of the subject properties acquired as of January 1 of each year from 1984 through 1987. (In his opinion, the predominant soil type of a property had a strong impact on the value.) The resulting estimated sales values (rounded) were: Land Acquired
as of Jan. 1
Value
1984
$ 9,733,000
1985
6,141,000
1986
478,000
1987
2,512,000
In estimating the sales values, he stated that the value of improvements, except those of "abnormally high quality and functional utility", tended to be reflected *468 in the land value. Bearden then attempted to determine a rate of return a knowledgeable investor would require. In this regard, he considered the prime rates and rates on 10- and 20-year Treasury bonds for November 1983 through November 1987, which ranged from 7.25 to 11.77 percent, the mortgage rate on real estate in 1984 and 1985, which he stated was 13 percent, and a 12 percent rent-to-investment ratio, which he stated was provided by the General Services Administration as not atypical for commercial property. From this, he estimated total market rents for each year (prorating for properties acquired midyear) as follows: Year
Rental Rate
Rent
1984
13.0%
$ 1,753,000
1985
12.5%
2,106,000
1986
11.5%
2,224,000
1987
-- 2,412,000
Bearden testified that he would not be surprised at typically achieved rates of return of 1 to 8 percent [8] for land in all parts of Oklahoma. He acknowledged that a less intensive farming operation than that of the Corporation would not pay the amounts of rent he calculated. *469 b. James S. Plaxico
Petitioners also presented the report, two supplemental reports, and testimony of Dr. James S. Plaxico (Plaxico), a former professor of agricultural economics at Virginia Polytechnic Institute and Oklahoma State University with a Ph.D. in agricultural economics. From 1979 through 1981, he was State executive director of the Agricultural Conservation and Stabilization Service of the United States Department of Agriculture. He taught for over 30 years, retiring as emeritus professor in 1988, and has since been a consultant. Plaxico evaluated the cropland included in the subject properties as it would be utilized by a profit-maximizing landlord renting the properties to an efficient farming tenant on a cropshare basis. (He testified that this method of analysis was appropriate since crop-share, [9] rather than cash, is the predominant mode for leased cropland in Oklahoma.) Plaxico determined the rent for pasture land by using the animal unit method. Under this method, rents from grazing animals on the land can be determined from the number of acres required to support an animal unit (a 1,000 pound animal) for a month (AUM). *470 Plaxico relied on visits to the properties; historical yields, prices, and rental data from crop and livestock budgets prepared by New Mexico, Texas, Kansas, and Oklahoma State Universities, and from the Oklahoma Enterprise Budget Book by the Oklahoma Department of Agriculture; surveys of rental arrangements and rates from Oklahoma State, Kansas State, and New Mexico State Universities; professional consultations; and soil survey data as to the farms. From this data, he estimated the "purely agricultural rental value" of the subject properties. He considered the average yields and selling prices of alfalfa and wheat for 1984 through 1987 and the common lessor's crop-share returns for the appropriate county relating to each of the six farms. From these, he projected yields and estimated the lessor's net rents for the subject properties' acreage used for growing alfalfa and wheat. [10] Plaxico considered the subject properties to be "quality" soil for growing alfalfa. He assumed a 5-to-2-year rotation of alfalfa to wheat for dry land, and a 5-to-1-year rotation for irrigated land, and multiplied the rent per acre for each soil type by the number of acres of that type. Additionally, *471 he assumed full participation in Government subsidy programs for wheat, which he estimated resulted in annual rent of about $ 40,000. Using the crop-share projections and cash rents for grazing, the total annual rent relating to the purely agricultural value of the subject properties was $ 1,890,874. To this, Plaxico added $ 114,349, which he estimated was the lessor's share of "plottage" value, [11] the value of economies of scale (i.e., fixed machinery costs and supplies) spread over relatively larger farms. The total annual rent originally estimated by Plaxico was $ 2,005,224. *472 Two supplemental reports of Plaxico were presented. In the first, Plaxico estimated additional annual plottage value (1) from use of custom harvest equipment and savings on supplies, of which the estimated lessor's share was $ 133,281, and (2) from the waste system of the Corporation based on projected water savings of $ 1,139,165, the lessor's share of which is not clearly stated. In the second, he attempted to verify his alfalfa yield estimates based in part on examining the results from small experimental plots operated by Oklahoma State University. Plaxico acknowledged that in a crop-share arrangement the lessor typically participates in management and shares expenses (see supra note 9). A document in the record entitled "Developing Cash Lease Agreements for Farmland" prepared by members of the Division of Agriculture of Oklahoma State University reflects that in converting crop-share arrangements to cash rental there should be an adjustment for reduced risk under the cash rental, which was estimated to be about 5 to 15 percent. 2. Respondent
Alan M. Schmook
Respondent presented a report, supplemental report, and testimony of Alan M. Schmook (Schmook), a member *473 of the American Institute of Real Estate Appraisers and Society of Real Estate Appraisers with about 14 years' experience. He considered the subject properties [12] *474 separately, and visited each of the properties; however, he did not initially value the improvements on the properties. He analyzed the soil types of the six farms formed from the land rented to the Corporation, designating the composition of the acreage between class I, the best soil, to class VIII, the poorest soil. He referred in his report to 24 leases involving cash rentals, [13] with dates ranging from 1985 through 1990, which he opined were comparables. The leased parcels ranged from 60 to 2,764 acres in size, but only two exceeded 640 acres and most were less than 200 acres. Nineteen of these leases, covering land leased by the Commissioners of Land Office as school trust land or by the Bureau of Indian Affairs, involved leases which were bid for at public auctions. [14] Of the remaining five, two were the third party leases to the Corporation of the Johnson Leased Land and the Squires Leased Land, on which the lessors retained rights. From these leases, Schmook selected several as comparables for each of the subject properties. Based on surveys of the Federal Reserve Bank in Kansas City and the Oklahoma Department of Agriculture, he estimated separate cash rents for irrigated and dry cropland and pasture for the subject properties and made timing adjustments to reflect estimated rents as of December 31 of the years 1984 through 1986. He then multiplied the estimated rents by the acreage of each soil type on each of the subject properties. In *475 reaching his conclusions, Schmook relied on the lease comparable methodology described above. In his report, he also considered 34 land sales [15] in Oklahoma, but used them only as support for his conclusions because his comparable sales methodology required using rent-to-value ratios taken from surveys as the appropriate rental rates of return and he considered these too susceptible to error. Based on statistics collected by the U.S. Department of Agriculture published by the Oklahoma State Department of Agriculture, his report reflects rent-to-value ratios ranging from 2.5 to 4.7 percent, without differentiating between irrigated and dry cropland. Schmook conceded that during the mid-1980s when land values declined, the rent-to-value ratios for irrigated cropland rose to 8.5 percent. Although *476 his report does not provide a total amount of annual market rent, Schmook appears to conclude that this would be $ 570,726 for 1984; $ 580,236 for 1985; and $ 668,832 for 1986. In his supplemental report, Schmook considered the improvements on the subject properties acquired and concluded that except for the houses, they were typical improvements for the size of the tracts and did not contribute additional value exceeding the land value. Based on houses being rented in Oklahoma and considering relative square footage, Schmook concluded that the additional rental value of the houses on the subject properties was $ 47,100. Schmook could not find comparably sized rental properties and so considered that the leased properties would have to be broken up and rented in smaller parcels to unrelated parties. He acknowledged that there were situations where there could be added value from plottage. He did not analyze the optimum crop which could be grown on the subject properties, nor did he use a cropshare analysis. Some of the leased land Schmook selected as comparables was not in the same county as any of the subject properties, and in some instances was 250 to 400 miles away. None *477 of the land leased by the Commissioners of Land Office, which he considered as comparables, was used to grow alfalfa or included an increment to its rental value for grazing. In one instance, leased land, which he selected as a comparable, had a highway and railroad running through the middle of it, which he acknowledged would make farming more difficult, and require guarding mechanisms. Schmook did not analyze whether that portion of the subject properties being used as pasture land could be used for growing crops; instead, he valued it at the lower values for pasture land, despite the soil type. Schmook did not consider the availability of subsurface well water on the 6,744 acres of Shattuck Farm land, nor did he know whether the leased land he used as comparables had water rights. He conceded that he was in error in selecting these comparables because they were "scrubby pasture" without irrigation whereas the Shattuck Farm land was irrigated. In reaching his conclusions as to some of the subject properties, Schmook did not consider any revenue from the pecan tree harvest. Subsequent to preparing his initial and supplemental reports, Schmook reinvestigated the comparable leases *478 he selected, including the leasing history, and the general background relating to leases of land owned by the Commissioners of Land Office and Bureau of Indian Affairs. After the reinvestigation, Schmook still considered these leases to be "acceptable" comparables. ULTIMATE FINDING OF FACT The rents paid for the years 1984 through 1987 by the Corporation for the subject properties were not excessive. II. Gifts
William wrote a check dated December 31, 1983, to each of the children; the amount for each daughter was $ 20,000, for Murray, $ 8,970, and for Drew, $ 8,466. [16] William mailed the checks to Murray in Kansas and to Drew in Arizona; he handed his daughters their checks on December 31, 1983. Each check was endorsed for deposit to the Corporation and each was deposited into an interest-bearing account which the Corporation established for its employees and from which withdrawals could be made on 1 day's notice. Each check bore deposit date stamps of "01/10/84 PEG BOK" and "JA '84' 11 F.R.B. of K.C.". *479 No evidence was presented, or testimony given, that William had sufficient funds in his bank account on December 31, 1983, to cover the checks. None of the donees testified. ULTIMATE FINDING OF FACT The checks to the children were gifts by William and Mary in 1984. III. Duplicate Depreciation
On its income tax return for fiscal year 1986, the Corporation claimed $ 9,553,613 in depreciation; the attached Form 4562 set forth the total amount with a notation: "DETAIL VOLUMINOUS; AVAILABLE UPON REQUEST". The notice of deficiency for the Corporation with respect to its fiscal year 1986 contained an adjustment of $ 552,244, $ 129,186 of which was explained as "1986 Tax depreciation duplicated". By stipulation, petitioners conceded $ 318,202 of the depreciation adjustment for the Corporation for fiscal year 1986; respondent conceded the balance. The record does not indicate which of the depreciation adjustments were conceded by the respective parties. OPINION I. Rent
Respondent contends that the rents paid by the Corporation for the subject properties were not established at arm's length between unrelated parties. Therefore, except for the amounts which Schmook *480 concluded were market rents, respondent disallowed a corporate deduction for that portion of the rents which respondent deemed excessive. On the other hand, petitioners maintain that the amount of the rents was not excessive, as established by their expert witnesses; the rentals were negotiated at arm's length to cover debt service plus a slight profit; and the rentals are deductible under section 162. We agree with petitioners that the amount of rent was not excessive and is thus deductible. The pertinent law regarding the deductibility of rental expenses where there is a close relationship between the lessor and lessee, and in which there is no arm's-length dealing between them, was succinctly summarized in Levenson & Klein, Inc. v. Commissioner, 67 T.C. 694, 715 (1977), as follows: Section 162(a)(3) provides that a taxpayer may deduct all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business including: (3) rentals or other payments required to be made as a condition to the continued possession, for purposes of the trade or business, of property to which the taxpayer has not taken or *481 is not taking title or in which he has no equity.
As in the case of salary or compensation, section 162(a)(3) does not specifically limit deductions for rental payments to a "reasonable allowance." Nevertheless, "When there is a close relationship between the lessor and lessee and in addition there is no arm's length dealing between them, an inquiry into what constitutes reasonable rental is necessary to determine whether the sum paid is in excess of what the lessee would have been required to pay had he dealt at arm's length with a stranger." Moreover, "The statute does not permit the deduction of an amount which is in no sense a legitimate business expense." We must inquire as to whether amounts claimed as deductible rental payments were in fact something else paid under the guise of rent, and the extent, if any, such payments were in excess of what was required to be made as a condition to the continued use and occupancy of the property. Petitioner has the burden to prove that "payments were wrung from it by compulsion of circumstances delineated by law. The question whether surrounding conditions drove taxpayer through this narrow gate" is factual. [Citations omitted.]
*482 Here, the close relationship between the lessee (the Corporation) and the lessors (William and the Partnership) necessitates that we decide whether the rents were in excess of the amount which an unrelated lessee would have paid in an arm's-length transaction. See, e.g. Harmon City, Inc. v. United States, 733 F.2d 1381, 1383 (10th Cir. 1984); Smith v. United States, 278 F. Supp. 230 (S.D. Tex. 1968). In this regard, each of the parties presented expert witnesses. However, we are not bound by the opinion of any expert witness, but may reject all or a portion of any expert's opinion which is contrary to our sound judgment. Parker v. Commissioner, 86 T.C. 547, 561 (1986). And we note that factual valuation questions involve inherently imprecise decisions, which are better suited to settlement. 885 Investment Co. v. Commissioner, 95 T.C. 156, 167 (1990); Symington v. Commissioner, 87 T.C. 892, 904 (1986); see Harmon City, Inc. v. United States, supra at 1385. The methodology of each of the *483 expert witnesses is flawed in some respect. On balance, Bearden's methodology is the least flawed. In reaching his conclusions, Bearden assumed that the highest and best use of the subject properties was as a dairy operation like that of the Corporation. During cross-examination, he acknowledged that he considered such a use financially feasible using "20-20 hindsight". The highest and best use of property is based on its realistic potential uses on the valuation date. Symington v. Commissioner, supra at 897; Stanley Works v. Commissioner, 87 T.C. 389, 400, 401 (1986). The relevant dates here are those upon which the Corporation began leasing the subject properties, which were shortly after each was acquired. See Velvet Horn, Inc. v. Commissioner, T.C. Memo. 1981-227; Clairton Slag, Inc. v. Commissioner, T.C. Memo. 1979-485. At best, we are left with doubt regarding Bearden's opinion as to feasibility of the use in the dairy operation as of the relevant dates. We agree with Plaxico that the highest and best use of the subject properties was as components *484 of the six farms, which would be used to maximize farming income. However, this use is not incompatible with Bearden's overall methodology. Indeed, Schmook used this methodology as support for his primary methodology, and on brief respondent focuses on Schmook's supporting methodology as being appropriate, despite respondent's position that the subject properties be valued as separate parcels of farmland. Bearden's methodology involved selecting sales of purportedly comparable land, from which market selling values were derived based on the comparison of soil classifications for the subject properties. We consider the comparables selected by Bearden to be closer to the subject properties in terms of respective locations, and in one instance, size, than those selected by Schmook for his supporting method. The final step of Bearden's methodology is selecting a market rental rate to apply to the selling values, which results in market rent. On brief, respondent contends that Plaxico's article, which states that rental rates in Oklahoma had historically ranged from 3 to 7.5 percent, and Bearden's testimony that a less intensive farming operation than that of the Corporation would *485 not pay the "market" rents he calculated, undercut the rates Bearden selected. We conclude that the market rental rates were at least 10.5 percent, considering the high quality of the subject properties and the predominant soil type of each. We note that an article introduced into evidence by respondent states that the rental rate could appropriately be determined by using the interest rate on certificates of deposit increased by a risk premium, and decreased by expected annual land appreciation or increased by the expected annual decrease in value. Bearden's report indicates that the prime rate ranged from 7.5 to 11.77 percent during the years in issue, and real estate values were declining. We have found as a fact that the amounts of rent paid by the Corporation for the subject properties for each of the years in issue were not excessive. Therefore, we need not reach respondent's constructive dividend and gift determinations relating to the perceived excess rental portion. II. Gifts
Section 2501 imposes a tax on the transfer of property by gift. Section 2511 defines the transfers to which the gift tax applies. Section 25.2511-2(b), Gift Tax Regs., provides, in relevant *486 part: As to any property, or part thereof or interest therein, of which the donor has so parted with dominion and control as to leave in him no power to change its disposition, whether for his own benefit or for the benefit of another, the gift is complete. But if upon transfer of property (whether in trust or otherwise) the donor reserves any power over its disposition, the gift may be wholly incomplete, or may be partially complete and partially incomplete, depending upon all the facts in the particular case. Accordingly, in every case of a transfer of property subject to a reserved power, the terms of the power must be examined and its scope determined. * * *
Paragraph (c) adds that a gift is incomplete when "a donor reserves the power to revest beneficial title to the property in himself". Respondent contends that on the facts presented there is doubt as to whether William parted with control over the checks to the children so as to constitute completed gifts in 1983. Respondent further argues that under Estate of Dillingham v. Commissioner, 88 T.C. 1569 (1987), affd. 903 F.2d 760 (10th Cir. 1990), the "relation *487 back" doctrine, [17] as argued by petitioners, does not apply to a noncharitable situation. Petitioners contend that the gifts were completed in 1983 upon delivery of the checks to the children and that Estate of Dillingham is distinguishable.
Whether the donor (here, William) has so parted with dominion and control over gift property (here, the checks to his children) so as to leave the donor with no power to change its disposition is determined by State law. In Estate of Dillingham v. Commissioner, supra, the donor (a resident of Oklahoma) delivered checks on or about December 24, 1980, as gifts to six individuals. *488 The checks were not presented for payment until late January of 1981, together with six additional checks delivered at that time. Some of the donees were apparently related to the donor. We concluded that the relation back doctrine did not apply because the donor's estate failed to explain the 35-day delay in cashing the checks and failed to present evidence that there were sufficient funds in the donor's checking account to cover the checks at the time of delivery. Additionally, we concluded that under Oklahoma law the donor could have stopped payment on the checks so that delivery of the checks could not be considered a completed gift. In affirming, the Court of Appeals for the Tenth Circuit agreed with both conclusions, and stated as to the relation back doctrine: Were we to extend the relation back doctrine to the circumstances of this case, the tax scheme established by Congress and the policy choices that scheme represents could be easily frustrated through a mutual understanding between donor and donee that gifted checks not be cashed until some future date after the end of the year. The donor would thereby be able to reap the favorable estate and gift tax benefits *489 attending limited yearly transfers of property when, in fact, he has not relinquished the control and use of the property (the cash in this case). This court is not inclined to open the door to such arrangements. Accordingly, we decline to extend the relation back doctrine to the circumstances of this case, where all of the checks were distributed in one year, 1980, and cashed on the same day in late January 1981. [7]
903 F.2d at 764-765. Subsequently, in Estate of Metzger v. Commissioner, 100 T.C. 204 (1993), we applied the relation back doctrine in a noncharitable gift situation. We concluded therein that completed gifts occurred in 1985, where four checks were drawn against the donor's checking account on December 14, *490 1985, and were deposited in the donees' savings accounts on December 31, 1985, but did not clear until January 2, 1986. We distinguished Estate of Dillingham v. Commissioner, supra, on the grounds that the parties agreed that there were at all relevant times sufficient funds in the account on which the checks were written and the checks were presented for payment on December 31, 1985. In this case, checks dated December 31, 1983, were hand-delivered on that date to two of the donees, and by mail to two others, both of whom lived out of State. The checks were endorsed to the Corporation for deposit in an in-house account. The checks all cleared the Kansas City Federal Reserve Bank on January 11, 1984. There is no evidence in the record to indicate that William had sufficient funds in his checking account on December 31, 1983, to cover the checks. Further, there was no explanation given as to why all of the checks cleared on the same date, January 11, 1984, when two of them were sent out of State and returned, and two were delivered by hand. On brief, respondent argues that the checks presumably were returned to William well into 1984 for deposit *491 into the corporate savings account. Hence, respondent contends William maintained dominion and control over the checks physically as well as legally well after the conclusion of 1983. Respondent states on brief: The fact that each child dutifully returned every dollar of the gift checks to be placed into their corporate savings account casts some doubt whether the checks were issued without strings of any sort. This is particularly so in view of the fact that the alleged savings accounts were the source of funds from which the children paid for their RBI stock and their interests in [the] Partnership.
William and Mary bear the burden of showing that unconditional gifts occurred by yearend 1983. Rule 142(a). On this record, we cannot conclude that they meet their burden of proof. Based on the record, we further hold that the relation back doctrine is not applicable. III. Additions to Tax
In view of our conclusion that the rent paid by the Corporation was not excessive, neither William, Mary, nor the Corporation is liable for the section 6661 addition to tax, nor is William or Mary liable for the section 6653(a) addition to tax relating to the rent issue. With *492 respect to respondent's determination that the Corporation is liable for the section 6661 addition to tax as a result of the duplicate depreciation deduction of $ 129,186, petitioners contend such addition to tax should not be imposed because the duplication was "simply a mathematical error by Arthur Young & Co.", the Corporation's tax preparer. Section 6661(a) provides for an addition to tax equal to 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax which is assessed after October 21, 1986. Pallottini v. Commissioner, 90 T.C. 498, 503 (1988). For a corporation, an understatement is substantial if the amount of the understatement for the year exceeds the greater of 10 percent of the tax required to be shown on the return, or $ 10,000. Sec. 6661(b)(1). The understatement is reduced for amounts attributable to the tax treatment of items for which the taxpayer had substantial authority or the relevant facts relating to which were adequately disclosed on the return or a statement attached thereto. [18]Sec. 6661(b)(2)(B). *493 Pursuant to section 6661(c), the Secretary may waive the section 6661 addition on the taxpayer's showing that there was reasonable cause for the understatement and the taxpayer acted in good faith. In general, a computational error would constitute reasonable cause and good faith; depending on the circumstances, good faith, reasonable reliance on an accountant's advice could justify the waiver. Sec. 1.6661-6(b), Income Tax Regs. Here, the record is silent as to whether petitioners requested a waiver and submitted supporting materials to respondent. The appropriate standard of review for the denial of a waiver is whether the refusal to waive the section 6661 addition constitutes an abuse of discretion. Mailman v. Commissioner, 91 T.C. 1079, 1083-1084 (1988). Petitioners bear the burden of showing that respondent's determination of the section 6661 addition to tax is erroneous. Rule 142(a). There was no testimony as to the explanation for the duplicate deduction nor was evidence introduced as to the information furnished Arthur Young & Company in preparing the Corporation's return. Merely placing the return, which does not have any explanatory *494 schedule attached or other explanation, in evidence and asserting on brief that a mathematical error occurred does not satisfy petitioners' burden. Thus, we sustain respondent's determination of the section 6661 addition to tax relating to the duplicate depreciation claimed by the Corporation for fiscal year 1986. Respondent also determined additions to tax under section 6653(a)(1) and (2) as to William and Mary for 1984 relating to "petitioners' failure to properly report cash gifts to their children". Section 6653(a)(1) provides for an addition to tax if any part of the underpayment is due to negligence or intentional disregard of the rules and regulations. Section 6653(a)(2) imposes a further addition to tax equal to 50 percent of the interest due on the portion of the underpayment attributable to the negligence for taxes due after December 31, 1981. Negligence is the lack of due care, or the failure to do what an ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Our holding for respondent that the gifts occurred in 1984 is largely based on William's failure to show that he had sufficient *495 funds in his checking account on December 31, 1983, to cover the gift checks and that the checks were unconditionally delivered to the donees on December 31, 1983. We do not believe the section 6653(a)(1) and (2) additions to tax should be imposed in this situation. Accordingly, respondent's determination in this regard is not sustained. To reflect the foregoing and concessions of the parties, Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: W. H. Braum, Incorporated, docket No. 28780-90; Braum Ice Cream Stores, Incorporated and Subsidiary, docket No. 28781-90; William H. Braum and Mary E. Braum, docket No. 28785-90; Elaine M. Braum, docket No. 28786-90; Rebecca A. Hersh, docket No. 28789-90; Joel R. and Rebecca A. Hersh, docket No. 28791-90; Drew M. and Deborah A. Braum, docket No. 28792-90; Murray G. and Jeanne G. Braum, docket No. 28793-90; William H. Braum, Donor, docket No. 13163-91; Mary Elaine Braum, docket No. 13219-91.↩
2. For the fiscal year 1987, the Corporation elected to be treated as an S corporation.↩
3. The gifts came from William's funds; but for tax purposes, the gifts are deemed to be from both William and Mary. See sec. 2513. Apparently, William and Mary took advantage of the $ 20,000 per donee gift-splitting exclusion available under secs. 2503(b) and 2513(a) for 1984.↩
4. The buildings and improvements purchased by the Partnership totaled about $ 1,400,000.↩
5. The improvements included (1) a 10,000-square-foot corporate headquarters and residence for William and Mary at the Tuttle Farm, which was built to exacting standards at a cost of $ 3,673,000, and (2) a dairy plant costing $ 15 to $ 20 million.↩
6. During the 2 months before a calf is born, the cows do not have milk.↩
7. There is some confusion in the record as to whether the pecan trees were located on the Asher or Stonewall Farm; however, the exact location of the trees does not affect the rent issue.↩
8. A research report in the record coauthored by Dr. James S. Plaxico, petitioners' other expert, states that such rental rates have historically (from 1945 through 1985) ranged from 3 to 7.5 percent. An article in the record entitled "Developing Share Lease Agreements for Farmland" states that one alternative capitalization rate used to estimate "annual land charge" is the interest rate on certificates of deposit increased by a risk premium, and decreased by any expected annual appreciation in land values or increased by any expected decrease in land values. From 1983, agricultural land values in Oklahoma declined, in some cases as much as 50 percent.↩
9. The crop-share method generally involves the lessor's participating in the management decisions and sharing expenses relating to the farming of leased property. Here, the Partnership did not participate in farm management or operations.↩
10. For Bermuda pasture and land used for growing wheat, as a measure of grazing yield, he estimated how many AUM's there were per acre and the lessor's share of related rent.↩
11. The plottage value also includes an element attributable to the assemblage of a single large-sized property composed of contiguous parcels (as contrasted with the separate values of the individual parcels composing the property), but does not include development potential or marketing economies.↩
12. Schmook's report refers to a total of 23,229 acres which is less than the stipulated total acreage of 23,328. The difference is due to the fact that Schmook's report left out information for one of the parcels.↩
13. In his report, Schmook stated that cash rentals were not typical or prevalent in the market, but later testified that he had changed his mind about this. He testified that he collected preliminary data relating to more than 500 leases, but considered many to be redundant or inappropriate as comparables.↩
14. Schmook considered the minimum bid for the rent of the land being auctioned to be the "fair rental or market rental rate"; he considered any greater bid as exceeding such rate. However, in many instances, the bids were not the result of competitive or spirited auctions.↩
15. Schmook testified that he considered preliminary data relating to 50 land sales, but selected only 34 for comparables because he considered the others to be redundant of those selected or not comparable for other reasons.↩
16. William wrote a check to a third party dated Dec. 27, 1983, which in numbered sequence followed the check which he wrote to Drew. William testified that he probably wrote all of the checks, including those for the children, on Dec. 27, 1983, but dated those for the children Dec. 31, 1983 because his accountant had told him they needed to be paid by the end of the year. The check written to the third party was stamped deposited on Jan. 4, 1984.↩
17. The relation back doctrine was first applied in Estate of Spiegel v. Commissioner, 12 T.C. 524↩ (1949), in which we concluded that for income tax purposes checks delivered as charitable contributions in late December of one year were considered paid in that year, even though not debited from the donor's account until the subsequent year.
7. We express no opinion as to circumstances where late December gifts are cashed immediately after the New Year holidays, when financial institutions are closed. Sufficient to say that those are not the circumstances of this case.↩
18. Understandably, petitioners do not contend that they had substantial authority for the duplicate depreciation claimed, or that there was adequate disclosure.↩