885 INVESTMENT CO., ENLOW OSE, TAX MATTERS
PARTNER, PETITIONERS *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

RICHARD D. AND M. ELNORA BRADISH, EDWARD A. AND
KAREN Y. CHRISTENSON, ROBERT R. AND NANCY J.
LADDISH, AND ENLOW AND MELENA OSE, PETITIONERS
*v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3547-87, 4560-87.          Filed August 16, 1990.

*Robert R. Rubin,* for the petitioners.
*James W. Clark,* for the respondent.

JACOBS, *Judge:* Respondent determined the following deficiencies in and additions to petitioners' Federal income taxes in docket No. 4560-87:

|  |  |  | Additions to tax | |
| Petitioner | Year | Deficiency | Sec. 6653(a)(1)*[1] | Sec. 6659 |
| Enlow & Melena | 1981 | $40,650 | $2,033 | $11,930 |
| Ose | 1982 | 27,984 | 1,399 | 8,395 |
| Edward & Karen Christenson | 1981 | 6,473 | 324 | 1,940 |
| Robert & Nancy Laddish | 1981 | 5,385 | 269 | 1,616 |
| Richard & Elnora Bradish | 1981 | 1,971 | 99 | 591 |

*Plus 50 percent of the interest due on the underpayment of tax attributable to negligence or intentional disregard of rules and regulations pursuant to section 6653(a)(2).

Respondent also determined that these petitioners (individual petitioners) were liable for increased interest on tax-motivated transactions pursuant to section 6621(c).

With respect to docket No. 3547-87, respondent issued a notice of final partnership administrative adjustment (FPAA) for 1983 to Enlow Ose, as tax matters partner for 885 Investment Co., a California limited partnership (885). In the FPAA, respondent increased 885's income by $1,078,023 as a result of the return of two parcels of realty which 885 had previously "donated" to the city of Sacramento (the city) and for which it claimed charitable contribution deductions.

These two cases were consolidated because of common issues of fact and law and because the individual petitioners in docket No. 4560-87 are partners in 885.

After a concession by respondent,[2] the issues for decision are: (1) Whether the individual petitioners are entitled to deduct their distributive share of 885's donation to the city in 1981, and if so, the amount thereof; (2) whether the individual petitioners are liable for the addition to tax under section 6659 and the increased interest under section 6621(c); (3) whether this Court has jurisdiction over 885; and (4) whether 885 is required to recognize income upon the city's conveyance of the donated properties back to 885, and, if so, the amount thereof.

___

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue.

[2] Respondent conceded the sec. 6653(a) additions to tax.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated herein by this reference.

The Oses, Christensons, Laddishes, and Bradishes are married couples who resided in California when they filed their petition. 885's principal place of business was in California at the time its petition was filed. Mr. Ose was the sole general partner of 885. The South Natomas area of Sacramento, California, is situated between downtown Sacramento and the metropolitan airport. During the late 1960's and early 1970's, several groups supported development of a scenic corridor along the interstate highways crossing the South Natomas area. On February 21, 1978, the Sacramento City Council adopted a land use plan known as the South Natomas Community Plan (the plan) which provided for the development of a scenic corridor along the portion of Interstate 5 bisecting the South Natomas area.

As contemplated by the plan, the scenic corridor would provide a buffer between the interstate highway and the abutting property. The outer boundary of the scenic corridor would be defined by an undulating masonry wall 8 to 10 feet high. The corridor itself would be landscaped with native trees, shrubs, grass, and wildflowers.

On August 23, 1978, approximately 178 acres were acquired by 885 in the South Natomas area (the South Natomas parcel) in a real estate exchange with Shell Oil. The South Natomas parcel was located on the north and south sides of West El Camino Avenue (West El Camino Avenue runs east and west) with Interstate 5 forming its eastern boundary. Interstate 5 runs north and south.

Sometime during 1978, representatives of the city contacted 885 to discuss the latter's willingness to transfer that portion of the South Natomas parcel lying within the scenic corridor to the city. By letter dated October 13, 1978, from its attorney, 885 offered to donate to the city that portion of its land within the scenic corridor; the donation was based upon 885's understanding that it would not have the responsibility for developing and maintaining the scenic corridor.

In June 1979, the city acquired 2.33 acres of land within the scenic corridor for $73,820 when an unrelated owner was unwilling to donate the property. Other than this single purchase, the landowners contributed all the other land within the scenic corridor.

By formal agreement between 885 and the city, dated December 21, 1979, and entitled Agreement for the Donation of Property for Interstate 5 Freeway Scenic Corridor (1979 Agreement for Donation), 885 agreed to donate approximately .664 acres situated south of West El Camino Avenue (1979 parcel). Because it was doubtful that the necessary State funding would be available to develop the scenic corridor as contemplated in the plan, the city required that the following language (paragraph 5 language) be included in the 1979 Agreement for Donation:

5. In the event the City does not use the real property [the 1979 parcel] as part of the Scenic Corridor along Interstate 5 Freeway, the City will, at no cost to the Owner, deed said real property back to the Owner or his successor or successors in title who are the owners of the parcel or parcels that are contiguous to the [1979 parcel] * * *

Concurrently with the execution of the 1979 Agreement for Donation, 885 signed a deed dated December 21, 1979, conveying the 1979 parcel to the city. 885 claimed a $115,695 charitable contribution deduction for the donation in its 1979 partnership return.

In June 1980, three alternate development plans were submitted by 885 to the city with respect to the South Natomas parcel. Each alternative required additional development authority beyond that contained in the plan.

In February 1981, 885 agreed to donate an additional 5.523 acres situated north of West El Camino Avenue (1981 parcel) to the city for purposes of the scenic corridor. Such was formalized in an agreement between 885 and the city dated February 23, 1981, and entitled Agreement for the Donation of Property for Interstate 5 Freeway Scenic Corridor (1981 Agreement for Donation). As with the donation of the 1979 parcel, the city required language similar to the paragraph 5 language to be incorporated in the 1981 Agreement for Donation. Concurrently with the execution of the 1981 Agreement for Donation, 885 executed a deed conveying the 1981 parcel to the city. 885

claimed a $962,328 charitable contribution deduction for the donation.

While State funding of the scenic corridor was doubtful when the 1979 and the 1981 parcels were donated, by mid-1982 the California Department of Transportation formally withdrew its participation in funding the scenic corridor. Given the corridor's odd shape and proximity to the interstate highway, coupled with the city's inability to generate its own funds for development, the land within the scenic corridor had little independent value to the city. In addition, the city's inability to properly police the corridor and its exposure to liability caused the city concern. Thus, the city decided to convey all land contributed for the scenic corridor back to the developers.

In December 1982, the city and 885 entered into an agreement which provided that (1) the city would convey the 1979 and 1981 parcels back to 885, (2) 885 would develop and maintain the returned parcels as a scenic corridor and contribute money to a fund to maintain the corridor, and (3) the permitted building density for the South Natomas parcel adjacent to the parcels being returned would be increased. In January 1983, and as part of the agreement, the city conveyed the 1979 and 1981 parcels back to 885. The reconveyance of the two parcels was subject to covenants and restrictions contained in a Declaration of Restrictions (declaration) recorded by the city. The declaration permanently restricted the use of the 1979 and 1981 parcels as follows:

1. No structure, edifice or buildings of any kind, or any piece of work artificially built up or composed of parts joined together in some definite manner, whether permanent, temporary or mobile, shall be located on the subject property. Examples of prohibited objects include, but are not limited to: vehicles, signage, pavement, artificial light sources, benches, picnic tables, barbeques, [sic] and fencing located either on the subject property or on the property line between the subject property and privately owned adjacent property.

2. No organized profit or non-profit activity shall occur on the subject property. The subject property may be used for picnics, walking, or jogging, if such activities are not planned or in any way arranged by a business, social or athletic club, community association, or similar formally organized group of individuals. * * *

OPINION

1. *Charitable Contribution Deduction*

The first issue is whether the individual petitioners are entitled to deduct as a charitable contribution their distributive share of 885's 1981 donation to the city, and if so, the amount thereof.

Section 170(a) allows a deduction for any charitable contribution, as defined in section 170(c), payment of which is made within the taxable year. Section 702(a)(4) provides that each partner in determining his income tax shall take into account separately his distributive share of the partnership's charitable contributions.

When property is transferred subject to a condition or power, section 1.170A-1(e), Income Tax Regs., provides in part:

If an interest in property passes to, or is vested in, charity on the date of the gift and the interest would be defeated by the subsequent performance of some act or the happening of some event, the possibility of occurrence of which appears on the date of the gift to be so remote as to be negligible, the deduction is allowable.

Thus, entitlement to the charitable contribution deduction depends on whether 885's gift of the 1981 parcel to the city was subject to a condition, the occurrence of which was not so remote as to be negligible.

In February 1981, the city and 885 entered into an agreement for the donation of 885's land within the proposed scenic corridor. Paragraph 5 of the 1981 Agreement for Donation allowed the city to convey the property back to 885 in the event it did not use the donated property as a scenic corridor. Respondent argues that on the date of the gift the occurrence condition contained in paragraph 5 was not so remote as to be negligible and, therefore, under section 1.170A-1(e), Income Tax Regs., no charitable contribution deduction is allowable. We agree.

The phrase "so remote as to be negligible" has been defined as "a chance which persons generally would disregard as so highly improbable that it might be ignored with reasonable safety in undertaking a serious business transaction," *United States v. Dean,* 224 F.2d 26, 29 (1st Cir. 1955), and "a chance which every dictate of reason would

justify an intelligent person in disregarding as so highly improbable and remote as to be lacking in reason and substance." *Briggs v. Commissioner,* 72 T.C. 646, 657 (1979), affd. without published opinion 665 F.2d 1051 (9th Cir. 1981).

According to the testimony of Solon Wisham, Jr. (Wisham), Sacramento's assistant city manager, at the time the scenic corridor was donated by 885, it was doubtful that the State of California would take the land from the city and assume the responsibility for landscaping and maintenance. (The city had been looking to the State for funding because the city did not have the necessary funds to accomplish the scenic corridor project.) Wisham further testified to legal concerns the city had if it permitted private development of the land while it retained ownership.

The city insisted that 885 accept the return of the property if the city could not use it as a scenic corridor. Such, in our opinion, when viewed in light of the financial and legal uncertainties the city harbored, is a clear indication that the return of the donated property to 885 was not so remote as to be negligible.

The individual petitioners argue that the city's purchase of 2.33 acres in June 1979 for $73,820 reflects the city's commitment to the scenic corridor and supports a conclusion that the possibility of the donated property being returned to 885 was negligible. We disagree. While the city may have previously purchased the 2.33 acres, it lacked funds to acquire all the acreage which was to comprise the scenic corridor. We thus conclude that when the property was donated by 885 to the city, a realistic possibility existed that the property would revert back to 885. Therefore, no charitable contribution is allowable.

2. *Section 6659 Addition to Tax and Section 6621(c) Increased Interest*

Section 6659(a) imposes a graduated addition to tax on an underpayment "attributable to a valuation overstatement." A valuation overstatement exists "if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined

to be the correct amount of such valuation or adjusted basis (as the case may be)." Sec. 6659(c).

Section 6621(c) provides for interest at the rate of 120 percent of the normal rate (under section 6601) on underpayments with respect to any substantial underpayment attributable to tax-motivated transactions. Section 6621(c)(3)(A)(i) categorizes "any valuation overstatement (within the meaning of section 6659(c))" as a tax-motivated transaction.

Here, the disallowance of the charitable contribution deduction was based upon the realistic possibility that the donated property could revert back to 885, and not on the basis of a valuation overstatement. Accordingly, the individual petitioners are not liable for either the addition to tax under section 6659 or the increased interest under section 6621(c). *McCrary v. Commissioner,* 92 T.C. 827 (1989); *Todd v. Commissioner,* 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988).

## 3. *Jurisdictional Issue*

In the FPAA, respondent proposed an adjustment increasing 885's income for 1983 as a result of the return of previously donated property. The Tax Matters Partner for 885 argues that the income adjustment attributable to the tax benefit rule is a "nonpartnership item" under the partnership audit and litigation rules contained in sections 6221 through 6233, and, consequently, we lack jurisdiction with respect to the 1983 adjustment to income.

This Court has jurisdiction to determine its jurisdiction. *Brannon's of Shawnee, Inc. v. Commissioner,* 69 T.C. 999, 1002 (1978). Jurisdictional issues can be raised by the parties or by the Court at any stage of the proceedings. *Normac, Inc. & Normac International v. Commissioner,* 90 T.C. 142, 146 (1988); *Kahle v. Commissioner,* 88 T.C. 1063 n. 3 (1987) and cases cited therein.

In partnership proceedings only partnership items are considered. *Munro v. Commissioner,* 92 T.C. 71 (1989); *Maxwell v. Commissioner,* 87 T.C. 783 (1986). A partnership item is defined as any item required to be taken into account for the partnership's taxable year to the extent the regulations provide that such item is more appropriately determined at the partnership level than at the partner

level. Sec. 6231(a)(3). The tax treatment is determined at the partnership level for partnership items. Sec. 6221.

The 885 tax matters partner argues that the regulations under section 6231(a)(3) do not specifically reference recoveries of previously deducted items as being more appropriately determined at the partnership level. Sec. 301.6231(a)(3)-1, Proced. & Admin. Regs. Further, 885 contrasts the "separately stated" regulations under section 702 which do provide that tax benefit items are to be separately stated. Sec. 1.702-1(a)(8)(i), Income Tax Regs.

We agree that the regulations under section 6231(a)(3) do not specifically reference tax benefit items. Nevertheless, we believe 885 has read the regulations too narrowly; we do not share its view that the absence of a specific referral causes tax benefit items to be nonpartnership items.

Pursuant to section 301.6231(a)(3)-1(b), Proced. & Admin. Regs., the legal and factual determinations underlying the determination of the amount, timing, and characterization of items of income, credit, gain, loss, deduction, et cetera, are partnership items. The FPAA was premised on the return of property to the partnership which had previously been claimed as a charitable contribution deduction. This factual basis underlies the amount, timing, and characterization of an item which must be separately stated on the partnership return as a tax benefit item. Sec. 702(a)(7) and sec. 1.702-1(a)(8), Income Tax Regs. Even though tax consequences can vary between individual partners, the characterization of a tax benefit item is made at the partnership level and, in our view, is properly a partnership item within the meaning of section 6231(a)(3). This conclusion is consistent with the purpose behind the unified audit and litigation procedures in providing a single unified proceeding to settle a common issue involving all partners. Accordingly, we conclude that we have jurisdiction over the determined 1983 adjustment to income.

4. *Tax Benefit Rule*

The final issue is whether 885 must recognize income upon the 1983 reconveyance of the properties contributed to the city in 1979 and 1981. 885 argues that the encumbrances and restrictions upon the parcels caused the prop-

erty to have negligible or nominal value, and thus it did not have income from the reconveyance of the parcels. Respondent contends that application of the tax benefit rule requires 885 to include in income the full amount of its prior charitable contribution deductions in 1979 and 1981.

The tax benefit rule is inapplicable to the deduction taken in 1981 because, as discussed earlier, the 1981 transfer failed to qualify for a charitable contribution deduction under section 170. Such deduction having been denied, the recovery of the 1981 parcel does not, under recognized tax benefit principles, result in income to 885. *Dobson v. Commissioner,* 320 U.S. 489 (1943); sec. 111.

The more difficult question is whether the tax benefit rule applies to the 1979 parcel. (The propriety of the 1979 charitable contribution deduction was not challenged by respondent.)

Clearly, the tax benefit rule applies to property once the subject of a charitable contribution deduction is subsequently returned to the donor. *Rosen v. Commissioner,* 71 T.C. 226 (1978), affd. 611 F.2d 942 (1st Cir. 1980); *Alice Phelan Sullivan Corp. v. United States,* 180 Ct. Cl. 659, 381 F.2d 399 (1967).

The traditional tax benefit rule requires taxpayers to recognize income when they "recover" an item or amount deducted in a previous tax year. In *Hillsboro National Bank v. Commissioner,* 460 U.S. 370 (1983), the Supreme Court held that the rule applies whenever a subsequent event that is fundamentally inconsistent with the previous deduction occurs.

This Court has applied the tax benefit rule only when the initial deduction was proper. *Streckfus Steamers, Inc. v. Commissioner,* 19 T.C. 1 (1952). Thus, when a taxpayer improperly claims a deduction in a prior year for which the statute of limitations has run, we have held that the subsequent recovery is not included in income. *Streckfus Steamers, Inc. v. Commissioner, supra; Southern Pacific Transportation Co. v. Commissioner,* 75 T.C. 497 (1980). Here, the 1979 charitable contribution deduction was improper for the same reasons that the 1981 charitable deduction was improper, and respondent should have chal-

lenged it prior to the expiration of the statutory period for assessment for 1979.

Several circuits have rejected or criticized the improper or erroneous deduction exception to the tax benefit rule, including the Ninth Circuit,[3] the circuit to which an appeal in this case would lie. *Golsen v. Commissioner,* 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). In *Unvert v. Commissioner,* 656 F.2d 483 (9th Cir. 1981), the Court of Appeals rejected the erroneous deduction exception and concluded that money the taxpayer received in a year subsequent to the time-barred year of deduction was income under the tax benefit rule. Accordingly, we are constrained to apply the tax benefit rule to 885's recovery in 1983 of the 1979 parcel.

We now turn to the proper amount 885 is required to include in income under tax benefit principles. 885 asserts that the amount of income it is required to include under the tax benefit rule is limited to the fair market value of the property received. Respondent urges us to conclude that tax benefit concepts require a complete reversal of the prior 1979 deduction so that 885 must include in its 1983 income the full amount of the prior deduction rather than the fair market value of the 1979 parcel. We agree with 885.

In our opinion, where a taxpayer receives a deduction for a charitable contribution in one taxable year and the donation is returned in a subsequent taxable year, the fair market value of the returned property is includable in income up to the amount of the charitable deduction previously taken. *Rosen v. Commissioner,* 611 F.2d 942 (1st Cir. 1980), affg. 71 T.C. 226 (1978); and *Tennessee Carolina Transportation, Inc. v. Commissioner,* 65 T.C. 440, 448 (1975), affd. 582 F.2d 378 (6th Cir. 1978). Such, we believe, roughly achieves a transactional parity in tax underlying the tax benefit rule.

Our final task therefore is to decide what the fair market value of the 1979 parcel was in 1983 when it was reconveyed to 885. In *Stanley Works v. Commissioner,* 87 T.C. 389, 400 (1986), we stated that the fair market value of

[3]*Unvert v. Commissioner,* 656 F.2d 483 (9th Cir. 1981); *Union Trust Co. v. Commissioner,* 111 F.2d 60 (7th Cir. 1940); *Kahn v. Commissioner,* 108 F.2d 748 (2d Cir. 1940); *Askin & Marine Co. v. Commissioner,* 66 F.2d 776 (2d Cir. 1933); *Commissioner v. Liberty Bank & Trust Co.,* 59 F.2d 320 (6th Cir. 1932).

property reflects the highest and best use of the property on the relevant valuation date. Any realistically available use of property due to its adaptability to a particular business is an element that must be considered in determining the fair market value thereof. *Mitchell v. United States*, 267 U.S. 341, 344-345 (1925); *Hilborn v. Commissioner*, 85 T.C. 677 (1985). Fair market value of property is not affected by whether the owner actually puts the property to its highest and best use. The realistic, objective potential uses for the property control the valuation thereof. *United States v. Meadow Brook Club*, 259 F.2d 41, 45 (2d Cir. 1958).

The declaration restricted the use of the 1979 parcel as a scenic landscaped corridor. Thus, on the relevant valuation date (i.e., the date the land was reconveyed by the city to 885), the 1979 parcel's highest and best use (and its only permitted use) was as a scenic landscaped corridor.

In *Stanley Works v. Commissioner, supra* at 408, we emphasized that valuation issues present questions of fact that can be resolved only by weighing all the evidence. We stated:

The issue presents a problem of judgment, not mathematics. *Hamm v. Commissioner*, 325 F.2d 934, 940 (8th Cir. 1963), affg. a Memorandum Opinion of this Court. "Valuation is * * * necessarily an approximation." *Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court. It is an inexact science at best, capable of resolution only by "Solomon-like" pronouncements. *Ketteman Trust v. Commissioner*, 86 T.C. 91, 98 (1986); *Buffalo Tool & Die Mfg. Co. v. Commissioner*, 74 T.C. 441, 452 (1980); *Estate of Heckscher v. Commissioner*, 63 T.C. 485 (1975).

In our judgment, the most persuasive evidence of the 1979 parcel's fair market value is the amount paid for comparable land purchased by the city. In June 1979, the city paid $73,830 for 2.33 acres within the scenic corridor. Although that sale took place 3½ years earlier than the date the city reconveyed the parcels to 885, it is an indication of what a willing buyer would pay a willing seller where neither is under a compulsion to buy or sell and both being fully apprised of all the relevant facts. Accordingly, we believe that the fair market value of the 1979 parcel on the date of reconveyance to 885 (i.e., in January 1983), was

$21,040 ($73,830/2.33 acres × .664 acres). Thus, $21,040 is the amount which 885 must include in its 1983 income.

*Decisions will be entered under Rule 155.*