T.C. Memo. 2017-245

UNITED STATES TAX COURT

SALT POINT TIMBER, LLC, JOHN B. HOOD, TAX MATTERS PARTNER,
Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 18057-14.                    Filed December 11, 2017.

Stanton P. Geller and William C. Elliott Jr., for petitioner.

Scott Lyons, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, Judge:  The respondent (referred to here as the "IRS") issued

a notice of final partnership administrative adjustment for the 2009 taxable year of

Salt Point Timber, LLC.  The notice disallowed a $2,130,000 deduction that Salt

Point Timber had reported for the charitable contribution of a conservation

easement.  The tax matters partner of Salt Point Timber, John Hood, timely filed a

**[\*2]** petition for a readjustment of partnership items under section 6226(a).[1]  We have jurisdiction under section 6226(f).[2]

We hold that no deduction is allowable because the conservation easement is not a "qualified conservation contribution" as defined in section 170(h)(1).  A defining characteristic of a "qualified conservation contribution" is that it is a contribution to a "qualified organization".  Sec. 170(h)(1).  The easement was initially contributed to a "qualified organization".  However, the easement provides that if certain conditions are met, the easement will be replaced by an easement encumbering an adjacent property.  The holder of the replacement easement is not required to be a "qualified organization".  See part 4.a of the opinion, below.  Although Hood argues that the possibility that the easement will be replaced is negligible, we hold that the possibility is more than negligible.  See part 4.b of the opinion, below.

_____

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended and in effect for the appropriate times, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Salt Point Timber is a limited liability company whose principal place of business, when the petition was filed, was South Carolina.  Therefore, an appeal of our decision in this case would go to the U.S. Court of Appeals for the Fourth Circuit, see sec. 7482(b)(1), unless the parties designate the Court of Appeals for another circuit, see id. para. (2).

[*3]                        FINDINGS OF FACT

In 1987, Salt Point Timber bought a 1,032-acre plot of land in Berkeley County, South Carolina. This land will be referred to as "the 1,000 acres".

On June 30, 2009, Salt Point Timber and the Lord Berkeley Conservation Trust (hereinafter the "Lord Berkeley trust") executed a conservation easement encumbering the 1,000 acres. Salt Point Timber received $400,000 for the contribution of the easement. The Lord Berkeley trust is a "qualified organization" as that term is defined by section 170(h)(1)(B).

Salt Point Timber had originally agreed to contribute the easement to another entity, the Trust for Public Land. However, this agreement was supplanted by subsequent agreements among Salt Point Timber, the Trust for Public Land, and the Lord Berkeley trust. These agreements provided that Salt Point Timber would instead contribute the easement to the Lord Berkeley trust.

On July 1, 2009, the easement was recorded in Berkeley County. We describe below the relevant terms of the easement.

The parties to the easement were Salt Point Timber, as the "Grantor", and the Lord Berkeley trust, as the "Grantee". Provisions of the easement define the rights and obligations of: (1) the "Grantor", (2) the "successors and assigns" of

**[*4]** the "Grantor", and (3) the "Grantee".  All references to "parts" in this opinion are to provisions of the easement, unless otherwise indicated.

Part 1 states:

> 1.  UNDERLINE_PURPOSE.  It is the purpose of this Easement to assure that the Property will be retained forever predominantly in its natural, scenic, and open space condition for conservation purpose and to prevent any use of the Property that will significantly and materially impair the conservation value of the Property.

 The term "Property" is defined in the easement as the 1,000 acres.

Part 6.7 provides that the easement perpetually burdens the 1,000 acres and that the easement can be assigned only to an "eligible donee":

> 6.7  Perpetuity.  The burdens of this Conservation Easement shall run with the land and shall be enforceable against the Grantor and all future owners in perpetuity.  The benefits shall be in gross and assignable, but only to an eligible donee as defined in Internal Revenue Code Section 1.170A-14(c)(1) [sic] as the section may be amended from time to time.

Part 6.9 also concerns the assignment of the easement:

> 6.9  Assignment by Grantee.  The benefits of this Conservation Easement are collective and cannot be separated or divided.  The benefits of this Conservation Easement shall not be voluntarily assignable by the Grantee without the Grantor's consent.  In the event that Grantee ceases to exist or exists but no longer as a tax exempt non-profit organization, qualified under Sections 501(c)(3) and 170(h)(3) of the Internal Revenue Code of 1986, as amended, then the easement shall automatically become vested in a tax-exempt non-profit organization which is designated by the Grantor and which assignee has experience in holding similar conservation easements.

[*5] Part 6.22 provides:

> 6.22  Boundary Line Adjustments.  Notwithstanding any provision to the contrary, in the event that (i) any of the Protected Property is transferred to the owner of an adjacent property * * *, (ii) the adjacent property is encumbered by a comparable conservation easement and (iii) the owner of the adjacent property and the holder of the conservation easement agree to modify the conservation easement on the adjacent property to encumber the transferred property by the adjacent property's conservation easement, the parties agree to amend this easement to release the transferred property from this easement.

The term "Protected Property", which is used in part 6.22, is not defined.  But there is no dispute that it means the same thing as the term "Property"--i.e. the 1,000 acres.  Part 6.22 can be summarized as follows:  Regardless of the other provisions of the easement, if (1) Salt Point Timber transfers any part of the 1,000 acres to an owner of an adjacent property, (2) the adjacent property is encumbered by a "comparable conservation easement", and (3) the owner of the adjacent property and the holder of the adjacent easement agree to amend the terms of the adjacent easement to encumber the transferred portion of the 1,000 acres, then the transferred portion of the 1,000 acres will be released from the original conservation easement.  The easement does not define a "comparable conservation easement".

On March 8, 2010, Salt Point Timber timely filed its Form 1065, "U.S. Return of Partnership Income", for the 2009 tax year.  It reported a $2,130,000

[*6] deduction for the contribution of the easement. That amount is equal to the $2,530,000 appraised value of the easement minus the $400,000 cash received by Salt Point Timber.

On May 5, 2014, the IRS issued the notice of final partnership administrative adjustment. Hood filed the petition. A trial was held in Columbia, South Carolina.

## OPINION

1. Burden of proof

The petitioner ordinarily has the burden of proof. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). In this case the petitioner is Hood. The burden of proof is imposed on the IRS if the conditions of section 7491 are met. The record does not show, nor does Hood contend, that these conditions are met. Therefore, Hood bears the burden of proof.

2. Law and regulations

Section 170(a)(1) provides that "[t]here shall be allowed as a deduction any charitable contribution." Section 170(f)(3)(A) generally bars a deduction for the charitable contribution of a partial interest in property--i.e., "an interest in property which consists of less than the taxpayer's entire interest in such property". There are exceptions to this general rule for contributions of certain types of interests.

**[*7]** Sec. 170(f)(3)(B).  As provided by section 170(f)(3)(B)(iii), one of these types of interests is a "qualified conservation contribution".  A "qualified conservation contribution" is defined by section 170(h)(1):

> In general.--For purposes of subsection (f)(3)(B)(iii), the term "qualified conservation contribution" means a contribution--
>
> > (A) of a qualified real property interest,
> >
> > (B) to a qualified organization,
> >
> > (C) exclusively for conservation purposes.

The term "qualified real property interest" is defined by section 170(h)(2):

> Qualified real property interest.--For purposes of this subsection, the term "qualified real property interest" means any of the following interests in real property:
>
> > (A) the entire interest of the donor other than a qualified mineral interest,
> >
> > (B) a remainder interest, and
> >
> > (C) a restriction (granted in perpetuity) on the use which may be made of the real property.

The term "qualified organization", as the term is used in section 170(h)(1)(B), is defined by section 170(h)(3).  Section 170(h)(3) provides:

**[*8]** Qualified organization.--For purposes of paragraph (1), the term "qualified organization" means an organization which--

> (A) is described in clause (v) or (vi) of subsection (b)(1)(A), or

> (B) is described in section 501(c)(3) and--

>> (i) meets the requirements of section 509(a)(2), or

>> (ii) meets the requirements of section 509(a)(3) and is controlled by an organization described in subparagraph (A) or in clause (i) of this subparagraph.

Section 170(b)(1)(A)(v) refers to certain governmental units. Section 170(b)(1)(A)(vi) refers to nongovernmental organizations that are created or organized exclusively for certain purposes (religious, charitable, scientific, literary, educational, amateur sporting and anti-cruelty), that receive a substantial part of their support from government grants and contributions from the public, whose net earnings do not benefit a shareholder or individual, and that do not (1) lobby or (2) intervene in political campaigns. See sec. 170(c)(2). Section 501(c)(3) refers to nongovernmental organizations that are organized and operated exclusively for certain purposes (religious, charitable, scientific, public-safety testing, literary, educational, amateur sports, and anti-cruelty), whose net earnings do not benefit any shareholder or individual, and that do not (1) lobby or (2)

**[*9]** intervene in political campaigns. Section 509(a)(2) refers to organizations that meet certain tests of financial support. Section 509(a)(3) refers to certain types of organizations that are operated or controlled by certain other types of organizations.

Section 1.170A-14(c)(2), Income Tax Regs., "the transfer-by-donee regulation", provides:

> A deduction shall be allowed for a contribution under this section [i.e. section 1.170A-14, Income Tax Regs., which defines a "qualified conservation contribution"] only if in the instrument of conveyance the donor prohibits the donee from subsequently transferring the easement (or, in the case of a remainder interest or the reservation of a qualified mineral interest, the property), whether or not for consideration, unless the donee organization, as a condition of the subsequent transfer, requires that the conservation purposes which the contribution was originally intended to advance continue to be carried out. Moreover subsequent transfers must be restricted to organizations qualifying, at the time of the subsequent transfer, as an eligible donee under paragraph (c)(1) of this section. * * *

Section 1.170A-14(c)(1), Income Tax Regs., sets forth the requirements for an entity to be an "eligible donee":

> To be considered an eligible donee under this section, an organization must be a qualified organization, have a commitment to protect the conservation purposes of the donation, and have the resources to enforce the restrictions. A conservation group organized or operated primarily or substantially for one of the conservation purposes specified in section 170(h)(4)(A) will be considered to have the commitment required by the preceding sentence. A qualified organization need not set aside funds to enforce the restrictions that

[*10] are the subject of the contribution.  For purposes of this section, the term qualified organization means:

> (i) A governmental unit described in section 170(b)(1)(A)(v);
>
> (ii) An organization described in section 170(b)(1)(A)(vi);
>
> (iii) A charitable organization described in section 501(c)(3) that meets the public support test of section 509(a)(2);
>
> (iv) A charitable organization described in section 501(c)(3) that meets the requirements of section 509(a)(3) and is controlled by an organization described in paragraphs (c)(1)(i), (ii), or (iii) of this section.

Both section 1.170A-14(c)(1), Income Tax Regs., and section 170(h)(3) define "qualified organization".  Though these definitions are different in format, they are substantively the same.

Section 1.170A-14(g)(6)(i), Income Tax Regs., the "extinguishment regulation", provides:

> If a subsequent unexpected change in the conditions surrounding the property that is the subject of a donation under this paragraph can make impossible or impractical the continued use of the property for conservation purposes, the conservation purpose can nonetheless be treated as protected in perpetuity if the restrictions are extinguished by judicial proceeding and all of the donee's proceeds (determined under paragraph (g)(6)(ii) of this section) from a subsequent sale or exchange of the property are used by the donee organization in a manner consistent with the conservation purposes of the original contribution.

**[\*11]** Section 1.170A-14(g)(3), Income Tax Regs, the "negligible-possibility regulation", provides:

> A deduction shall not be disallowed under section 170(f)(3)(B)(iii) [the provision excepting a qualified conservation contribution from the anti-partial-interest rule of section 170(f)(3)(A)] * * * merely because the interest which passes to, or is vested in, the donee organization may be defeated by the performance of some act or the happening of some event, if on the date of the gift it appears that the possibility that such act or event will occur is so remote as to be negligible. * * *

3. <u>Positions of the parties</u>

Hood, the tax matters partner of Salt Point Timber, asserts that the contribution of the easement is deductible because it is a "qualified conservation contribution" under section 170(h)(1). In particular, he contends that the easement is a "qualified real property interest" because the easement is an interest in real property that is (in the words of section 170(h)(2)(C)) "a restriction (granted in perpetuity) on the use of which may be made of the real property."

The IRS makes several arguments why the easement is not a "qualified conservation contribution". We discuss two of them. First, the IRS contends that part 6.22 of the easement permits the original easement to be replaced by an easement held by an entity that is not a "qualified organization". Second, the IRS

**[*12]** argues that part 6.22 allows the 1,000 acres to be released from the original easement without the extinguishment regulation's being satisfied.

Hood argues that part 6.22 requires that the replacement easement be held by a "qualified organization". Further, Hood argues that the possibility of the easement's being replaced under part 6.22 is negligible and therefore should not cause the easement to fall outside the definition of a "qualified conservation contribution".

After the parties filed their briefs, the Court ordered them to submit memoranda addressing the effect of the transfer-by-donee regulation. In the IRS's view, the replacement of the original easement with an easement on an adjacent property under part 6.22 is not a "transfer" of the original easement. See sec. 1.170A-14(c)(1), Income Tax Regs. Rather, the IRS contends part 6.22 is a mechanism whereby the original easement would be extinguished and replaced with a new easement. Hood also does not contend that the replacement of the easement under part 6.22 should be considered a "transfer" of the original easement. However, he contends that part 6.22 requires that the holder of a replacement easement be an "eligible donee" (and hence a "qualified organization", see sec. 1.170A-14(c)(1), Income Tax Regs.).

[*13] 4.     Analysis

Hood does not contend that if part 6.22 of the easement permits the original easement to be replaced by an easement held by someone other than a "qualified organization", and if there is a greater than negligible possibility of the original easement's being replaced under part 6.22, the easement can still be a "qualified conservation contribution".  In other words, Hood essentially concedes that the easement is not a "qualified conservation contribution" if (1) part 6.22 permits the holder of a replacement easement to be an entity other than a "qualified organization" and (2) there is a non-negligible possibility that the easement will be replaced under part 6.22.  For reasons explained below, we hold that (1) part 6.22 permits the holder of a replacement easement to be an entity other than a "qualified organization", see part 4.a of the opinion, below, and (2) there is a non-negligible possibility that the easement will be replaced under part 6.22, see part 4.b of the opinion, below.  Therefore we conclude that the easement is not a "qualified conservation contribution".

    a.    Part 6.22 of the easement permits the holder of a replacement
          easement to be an entity other than a "qualified organization".

Part 6.22 of the easement contains no express condition that the holder of the replacement easement be a "qualified organization".  Part 6.22 has three

[*14] express conditions, that, when satisfied, require the parties to the easement to agree to replace the easement with the adjacent easement. None of the conditions are that the holder of the adjacent easement be a "qualified organization".

Hood argues that the Lord Berkeley trust has the power to veto the replacement of the easement under part 6.22 and, furthermore, that the trust would use this power to prevent the original easement from being replaced by an easement held by an entity that is not a "qualified organization". In our view, part 6.22 confers no such power upon the Lord Berkeley trust. Part 6.22 provides that "in the event" that the three conditions are met, the "parties [Salt Point Timber and the Lord Berkeley trust] agree to amend this easement to release the transferred property from this easement". Thus, when the three conditions are met, the Lord Berkeley trust is required by part 6.22 to release the transferred portion of the 1,000 acres from the easement. Its duty to do so is mandatory, not discretionary.

The third condition in part 6.22 is that "the owner of the adjacent property and the holder of the conservation easement agree to modify the conservation easement on the adjacent property to encumber the transferred property by the adjacent property's conservation easement". As Hood concedes in his opening brief, the term "holder of the conservation easement" refers to the holder of the

[*15] conservation easement on the adjacent property, not the holder of the easement on the 1,000 acres--i.e. the Lord Berkeley trust. Thus, the satisfaction of this condition does not require the Lord Berkeley trust's consent.

Hood argues that the South Carolina Conservation Easement Act of 1991, S.C. Code Ann. secs. 27-8-10 to 27-8-120 (1991), defines the "holder" of a "conservation easement" in such as way as to include only a "qualified organization". The provision of the act to which Hood refers is S.C. Code Ann. sec. 27-8-20. It provides:

As used in this chapter, unless the context otherwise requires:

(1) "Conservation easement" means a nonpossessory interest of a holder in real property imposing limitations or affirmative obligations, the purposes of which include one or more of the following:

(a) retaining or protecting natural, scenic, or open-space aspects of real property;

(b) ensuring the availability of real property for agricultural, forest, recreational, educational, or open-space use;

(c) protecting natural resources;

(d) maintaining or enhancing air or water quality;

(e) preserving the historical, architectural, archaeological, or cultural aspects of real property.

**[\*16]** (2) "Holder" means:

  (a) a governmental body empowered to hold an interest in real property under the laws of this State or the United States; or

  (b) a charitable, not-for-profit or educational corporation, association, or trust the purposes or powers of which include one or more of the purposes listed in subsection (1).

S.C. Code Ann. sec. 27-8-20(2) defines a "holder" only for the purposes of "this chapter", i.e. chapter 8 of title 27 of the Code of Laws of South Carolina. That chapter is the South Carolina Conservation Easement Act, a set of laws that regulates conservation easements. Even if we assume the definition of a "holder" in S.C. Code Ann. sec. 27-8-20(2) governs who can hold a replacement easement under part 6.22 of the easement, the word "holder" as defined by S.C. Code Ann. sec. 27-8-20(2) is not restricted to a "qualified organization". To be a "qualified organization" as that term is defined by section 170(h)(3), a nongovernmental organization must be described in either section 501(c)(3) or section 170(b)(1)(A)(vi). Sec. 170(h)(3). Both sections 501(c)(3) and 170(b)(1)(A)(vi) impose requirements which are not satisfied by virtue of an organization's being a "holder" under S.C. Code Ann. sec. 27-8-20(2). For example, sections 501(c)(3) and 170(b)(1)(A)(vi) (the latter, through a cross-reference to section 170(c)(2)(D)) require that the organization refrain from (1) lobbying or (2) intervening in

[*17] political campaigns.  See sec. 170(b)(1)(A)(vi), (c)(2)(D).  The definition of a "holder" in S.C. Code Ann. sec. 27-8-20(2) contains neither requirement.

Next, Hood maintains that any easement not held by a "qualified organization" would not be comparable to the original easement and hence not eligible to replace that easement under part 6.22 of the easement.  In support of this contention, Hood contends that parts 6.7 and 6.9 of the easement--provisions which govern the assignment of the easement--show that the parties to the easement intended that a "comparable conservation easement" under part 6.22 could be held only by a "qualified organization".  We think the opposite is true.  Part 6.22 does not define the term "comparable conservation easement".  Nor does it restrict who can hold a "comparable conservation easement".  Its omission of any restriction regarding the type of entity that can hold the replacement easement suggests that there is no such restriction.  By contrast, part 6.7 provides that the easement can be assigned to an "eligible donee" (and hence only to a "qualified organization" because only a "qualified organization" can be an "eligible donee" under section 1.170A-14(c)(1), Income Tax Regs.).  An assignment of the easement under part 6.7 is different from a replacement of the easement under part 6.22.  Because the easement limits those who can be assigned the easement under part 6.7 and does not limit who can hold a replacement easement under part 6.22,

**[*18]** we believe that no limitation was intended to be placed on the type of entity that can hold a replacement easement.

Part 6.9 provides that if the Lord Berkeley trust ceases to exist or qualify as an organization described in sections 501(c)(3) and 170(h)(3), then the easement will automatically pass to a "tax exempt non-profit" organization with experience in holding similar conservation easements. Part 6.9 thus addresses what happens if the Lord Berkeley trust ceases to exist or ceases to be an organization qualifying under sections 501(c)(3) and 170(h)(3). It does not address what happens when the three conditions in part 6.22 are satisfied. Because part 6.9 limits the type of organization in which the easement will automatically vest if the Lord Berkeley trust goes out of existence or is disqualified, and because part 6.22 does not limit the holder of a replacement easement, we believe that no limitation was intended to be placed on the type of entity that can hold a replacement easement. We conclude that neither part 6.7 nor part 6.9 suggests that the holder of a replacement easement under part 6.22 must be a "qualified organization".

There are other reasons we do not interpret the phrase "comparable conservation easement" in part 6.22 to refer only to an easement held by a "qualified organization". First, the reference to "comparable" easements is most naturally interpreted as a reference to the comparability of the terms of the

[*19] easements, not the owner of the easements. Furthermore, even if one thinks that a "comparable" easement can be held only by an entity that is "comparable" to the Lord Berkeley trust, it is difficult to say which of the Lord Berkeley trust's qualities another entity must share to make the other entity its "comparable". The Lord Berkeley trust is described by the easement as a "non-profit charitable corporation incorporated under the laws of South Carolina, whose address is 1005 Highway 52, Moncks Corner, SC 29461" but the easement does not require the holder of a replacement easement to have some or all of these characteristics. Even if we assume that the easement requires the holder of a replacement easement to be a "non-profit charitable corporation", in keeping with the description of the Lord Berkeley trust, that would not be the same thing as a "qualified organization". Had the parties to the easement intended a replacement easement to be held only by a "qualified organization", they could have easily written such a restriction into part 6.22 of the easement. They did not do so. If the parties to the easement expected the word "comparable" to incorporate such a specific requirement, we do not think such an expectation was objectively reasonable.

**[*20]** b.     <u>The possibility that the easement will be replaced under part 6.22 of the easement is non-negligible.</u>

Hood argues that the possibility that the easement might be replaced under part 6.22 of the easement is negligible and therefore should not result in the disallowance of the deduction. Hood relies on the negligible-possibility regulation, section 1.170A-14(g)(3), Income Tax Regs. Interpreting that regulation, the Court has defined a negligible possibility as "a chance which persons generally would disregard as so highly improbable that it might be ignored with reasonable safety in undertaking a serious business transaction," <u>Graev v. Commissioner</u>, 140 T.C. 377, 393 (2013) (quoting <u>885 Inv. Co. v. Commissioner</u>, 95 T.C. 156, 161 (1990)), or, stated differently, "a chance which every dictate of reason would justify an intelligent person in disregarding as so highly improbable and remote as to be lacking in reason and substance," <u>id.</u> at 394 (quoting <u>Briggs v. Commissioner</u>, 72 T.C. 647, 657 (1979)).

Hood has failed to adduce persuasive evidence that the three conditions for replacing the easement under part 6.22 are so highly improbable or remote that they would be ignored. Nothing in the record indicates that Salt Point Timber would be averse to transferring the 1,000 acres. Although the record does not reveal whether any land adjacent to the 1,000 acres is encumbered by conservation

**[*21]** easements, several properties close to (but not adjacent to) the 1,000 acres are encumbered by conservation easements. These include properties that, like the 1,000 acres, are large landholdings in Berkeley County with river frontage and wetland habitats. When the Trust for Public Land originally applied for a federal grant under the North American Wetlands Conservation Act, 16 U.S.C. secs. 4401-4414 (Supp. II 2002), that would have funded its acquisition of the conservation easement, the trust stated that it expected that the donation of the conservation easement would "encourage neighboring landowners to commit their properties to conservation in a domino-effect fashion". State and local entities still encourage and subsidize the donation of conservation easements in this particular geographic area. It is also significant that Salt Point Timber and the Lord Berkeley trust bothered to put part 6.22 in the easement. In conclusion, we find that the possibility that the easement would be replaced under part 6.22 of the easement is more than negligible.

    c.    <u>Other arguments</u>

The IRS's second argument that we described is that part 6.22 of the easement permits the restrictions of the original easement on the 1,000 acres to be extinguished. We need not reach the merits of this argument because (1) part 6.22 permits the easement to be replaced with an easement held by an organization

**[*22]** other than a "qualified organization", (2) the possibility that the easement will be replaced under part 6.22 is not negligible, and (3) Hood does not argue that the easement is a "qualified conservation contribution" if circumstances (1) and (2) exist. Neither party contends that the replacement of the easement under part 6.22 is a transfer of the easement by the donee under the transfer-by-donee regulation. Thus, we do not consider the effect of that regulation.

5. Conclusion

We hold that the IRS correctly disallowed the $2,130,000 deduction for the donation of the conservation easement.

To reflect the foregoing,

Decision will be entered for

respondent.